ANDREW J. REED, APPELLEE, V. FRANCIS WELLMAN,
APPELLANT.

FILED APRIL 10, 1923. No. 22158.

1. **Statutes:** CONSTRUCTION: CONSTITUTIONALITY. In the construction of a statute, the word "shall" will be construed as "may" when necessary to sustain its constitutionality, if the intention of the legislature as disclosed by the language of the statute will be thereby accomplished.

2. ————: ————. BOUNDARIES. The word "shall" in section 4870, Comp. St. 1922, *held* to be permissive, and not mandatory.

3. **Trial:** INSTRUCTIONS: RELOCATION OF SURVEY. The court in one instruction stated fully and correctly the rules for relocating lost or obliterated corners of a government survey and stated that the question was "not how would an accurate survey locate these lands in question, but how did the original government survey and stakes locate them;" and by the following instruction referred to evidence of a survey made by one Green, saying, "if you find that said Green did follow the rules and instructions of such state surveyor, and if you find from all the evidence, not only of said Green, but all the other witnesses, and the facts and circumstances proved upon the trial, that said Green did accurately make such survey," they should find for plaintiff. *Held,* that the two instructions should be construed together, and that the latter one did not make the verdict depend simply upon the accuracy of the Green survey, but upon whether or not such survey correctly showed the line as established by the government surveyors.

4. **Landlord and Tenant:** ADVERSE POSSESSION. Possession of land acquired under a lease from the owner is not hostile, and does not become so until notice is brought home to the owner of an adverse holding by some unequivocal act of ownership by the claimant.

APPEAL from the district court for Hitchcock county: CHARLES E. ELDRED, JUDGE. *Affirmed.*

*Lambe & Butler* and *Walter D. James,* for appellant.

*J. F. Ratcliff* and *Stewart, Perry & Stewart,* contra.

Heard before MORRISSEY, C. J., LETTON, DEAN, ALDRICH and DAY, JJ., REDICK, District Judge.

REDICK, District Judge.

This is an action in ejectment, brought by plaintiff and appellee against the defendant and appellant, in

which there was a verdict for the plaintiff involving
about 15 acres of land claimed by the plaintiff to be a
part of the north half of the southeast quarter of section
14, and by the defendant to be a part of the northeast
quarter of said section. The answer contains three de-
fenses: (1) That the court is without jurisdiction for
failure of the plaintiff to comply with section 4870, Comp.
St. 1922; (2) that the land in controversy is a part
of the northeast quarter of said section; and (3) ad-
verse possession of the said land by defendant for ten
years. The material facts are substantially as follows:
Sometime prior to 1905 the defendant filed upon the
northeast quarter (and later received a patent) and
took possession of the same, and was also in possession
of the north half of the southeast quarter under a lease
from the owner, Nettie Ferris, which lease expired
March 1, 1909, at which time the plaintiff went into
possession of said 80 acres under a lease from Ferris,
and subsequently purchased the same. The deeds, patents
and leases describe the two tracts by governmental sub-
divisions. Sometime between 1905 and 1908 the de-
fendant erected a wire fence upon what he supposed was
the boundary line between the two tracts above de-
scribed. The evidence seems to indicate that as originally
built the fence was about 120 rods long and was not
completed entirely across the tract until the year 1911,
but we do not deem it necessary to determine the legal
question suggested by this fact. The west end of the fence
was about 20 rods and the east end about 13 rods south of
what the plaintiff claims is the true southern boundary
of the northeast quarter. Defendant surrendered pos-
session to the plaintiff of the land described in the lease
as the north half of the southeast quarter March 1, 1909,
but claimed and retained possession of all ground up to
the fence just mentioned. There seems to have been no
agreement, discussion or dispute between the parties as
to the proper location of the boundary line until the
spring of 1917, when plaintiff with some other parties

attempted to remove the fence, and had torn it down with the exception of about 30 or 40 yards at the west end, when they were stopped by defendant. Shortly thereafter plaintiff brought an action in equity in the district court for Hitchcock county to enjoin the defendant from interfering with plaintiff's possession of the 15 acres in dispute, which resulted in a decree for the plaintiff on the 21st day of May, 1918. The district court having refused to fix a supersedeas bond, the defendant removed his fence and gave up possession. The decree, however, was reversed by the supreme court, and mandate sent down April 27, 1920, on the ground that plaintiff's action should have been at law, in ejectment, the plaintiff's forcible entry not constituting an interruption of defendant's possession. *Reed v. Wellman*, 104 Neb. 292. The court, however, declined to determine any questions of title, leaving the same to an appropriate action at law. Thereupon, on the 28th day of May, 1920, this action was commenced.

We will take up the discussion of the question presented on this appeal in the order of the defenses as above given, and, first, the jurisdictional question. Section 4870, Comp. St. 1922, is as follows:

"In case of any dispute among owners of and arising for or by reason of any survey of boundaries of lands within this state, or in case of dispute or disagreement between surveyors as to said surveys of boundaries, the same shall be referred to the said state 'surveyor and draughtsman' for settlement, and he is hereby appointed as arbitrator to settle and determine such disputes or disagreements as to said surveys and boundaries, and whose decision shall be *prima facie* evidence of the correctness thereof. In making such surveys, the state surveyor and deputies shall, each of them, have power in any county of the state of Nebraska to summon and compel the attendance of witnesses before them to testify as to material facts relating to their knowledge of 'lost or obliterated' corners. Said state surveyor and deputies

are hereby authorized and empowered to administer oaths and affirmations to their assistants and to witnesses. There shall be paid to the state treasurer for the services of the said state surveyor and draughtsman in settling and disposing of the said dispute and differences the sum of eight dollars per day for each day's service actually performed by the said state surveyor and draughtsman, to be paid by the parties directly interested in the said controversy and said survey or said boundaries; and said sum or sums of money so received therefor shall be paid into the state treasury for the benefit of the general fund of the state."

The act passed in 1919 was a reenactment of section 4 of an act found in chapter 105, Laws 1903, the title to which latter act is in the following words: "An act providing for the appointment of a state surveyor and draughtsman in the office of the commissioner of public lands and buildings and to prescribe his duties." This was the first appearance of legislation of this character in this state. In 1909 (Laws 1909, ch. 137) the act of 1903 was amended and became section 5566, Rev. St. 1913. In 1919 (Laws 1919, ch. 54) section 5566, Rev. St. 1913, was amended, and said section repealed, which amendment was the reenactment above quoted (Comp. St. 1922, sec. 4870), the only change being in the *per diem* of the state surveyor from $6 to $8. The title of the act in 1919 was as follows: "An act to amend section 5563, 5565, and 5566, Revised Statutes of Nebraska for 1913, and to repeal said original sections and to declare an emergency."

It will thus be seen that it is necessary, in order to determine whether the amendments of the act of 1919 are germane to the original act or within its title, to revert to the title of the act of 1903 which is above set out; and it seems to us beyond any chance of controversy that the provisions of the act of 1919, if given the construction claimed for by the appellant, would be unconstitutional on the ground that the title to the

act gives no intimation that such provisions will be inserted and that the act to that extent, therefore, is broader than the title. The provisions specially referred to are those for the appointment of the deputy surveyor as an arbitrator to whom the parties involved in a dispute over boundaries of land must first present their respective claims and procure the decision of the surveyor thereon, which, in effect, seeks to provide a condition precedent to the presentation of the dispute to the courts of the state. The title, of course, is broad enough to compass the provision requiring the state surveyor to survey the disputed boundary and make a report thereon, because these may justly be considered as related to the performance of the duties of his office; but imagination falters when it is sought to wring from the words of the title any intention of the legislature to provide for a tribunal for the settlement of private disputes and to withdraw from the citizen his constitutional right to present his troubles to the courts and have them decided according to the law of the land, or prescribe a condition precedent to the exercise of such right.

However, it does not appear necessary at this time to determine the constitutionality of the section in question, as the section may be upheld under proper rules of construction so that the real intention of the legislature may be given effect. If the act is capable of two constructions, one of which would result in declaring it unconstitutional and the other leave it in force as a valid enactment, the latter construction, of course, must be preferred.

The concrete question then is whether the word "shall" in the sentence "the same shall be referred to the said 'state surveyor and draughtsman' for settlement" shall be construed as mandatory or permissive. If mandatory, as above suggested, we would be compelled to hold the law invalid. But the presumption always is that the legislature did not intend to do

Reed v. Wellman.

an unconstitutional act or to pass a law in an unconstitutional manner, and where to construe the statute as mandatory would make it unconstitutional such construction will be rejected if any other is possible. *In re Picquet,* 5 Pick. (Mass.) 65. Another principle to be borne in mind in determining whether or not a statute is mandatory or permissive is that, where the words are such as would naturally be used to prescribe directions for the orderly dispatch of business, they will not be construed as mandatory in the absence of negative or prohibitive words, or words expressive of a condition precedent. *Spencer's Appeal,* 78 Conn. 301.

With these principles in view, it seems that the word "shall" should be construed as permissive rather than mandatory, which will effectuate the intention of the legislature to provide by agreement of the parties a prompt and inexpensive method of determining disputed boundaries, without interference with the common law and constitutional right of the citizen to appeal to the courts. It follows that the court had jurisdiction and the first defense is not well taken.

The second question involves the true location of the south boundary of the northeast quarter of section 14. The evidence upon this question consists of a survey made by the county surveyor of Hitchcock county and his testimony regarding the same, and the evidence of the defendant and other witnesses as to the original location of the government corners. It presents some disputed questions of fact for the jury, whose finding thereon must control unless the record discloses error in the instructions of the court on the submission of the case to the jury. The instructions were very full and complete, and defendant's first complaint refers to No. 7, as follows:

"You are instructed by the court that in determining the question as to whether the land in dispute belongs to the subdivision owned by the plaintiff, to wit, the north half of the southeast quarter of section 14, in township

3 north, of range 35 west of the sixth principal meridian, you should ascertain whether surveyor R. O. Green followed the rules and instructions of the state surveyor in locating lost and obliterated corners, and in making surveys to establish the true boundary lines in dispute in this action. If you find that said Green did follow the rules and instructions of such state surveyor, and if you find from all the evidence, not only of said Green, but all the other witnesses, and the facts and circumstances proved on the trial, that said Green did accurately make such survey, and if you further find that such survey shows the tract of land in dispute belonged to the north half of the southeast quarter of said section 14, then it will be your duty to return a verdict in favor of the plaintiff, unless you find that the defendant has secured title to said disputed tract of land by adverse possession, as in these instructions defined."

Defendant contends that this instruction gives undue prominence to the Green survey; but it will be observed that the court tells the jury that they must consider the survey with the testimony of "all the other witnesses, and the facts and circumstances proved on the trial." We think, in view of the fact that Green was the only expert testifying, the court did not infringe upon the proprieties by this instruction. The court merely told the jury that if they found from all the evidence in the case that the survey of Green was correct they should find for the plaintiff, and this instruction, when read with No. 6, quoted later, clearly informed the jury that the real question was, not where Green located it, but where the government surveyors located the boundary line.

Another objection is that the instruction left to the jury to determine whether or not, in making his survey, Green had complied with the rules of the state surveyor in locating the corners, but that the rules *in toto* were not in evidence, and, therefore, there was nothing upon which the jury could base their finding. But it

appears that several sections of the rules applica'ble to that particular question were read in evidence by the witness, and the instruction must be construed as referring only to that portion of the rules in evidence.

A further objection is that the instruction made the determination of the boundary to depend upon the correctness of the Green survey. But instruction No. 6 clearly told the jury that the survey, to be correct, must correspond with the corners originally placed by the government surveyor, and that corners so established could not be moved and must be accepted. We think that instruction No. 6 correctly stated the law regulating the establishment of lost or obliterated government corners, and that the two instructions together are correct, and that the jury must have understood therefrom that before they could find the Green survey correct they must be satisfied that it established the line as originally surveyed.

In this connection defendant further calls attention to the fact that the northwest corner of section 16 was erroneously located by the survey in question as established in a survey made about a year later by the witness Green. The witness, however, testified that the establishment of that corner was not necessary to the determination of the boundary line in question, which was determined by measurements on the north and south lines of the section about which there is no dispute. The evidence shows that the surveyor started at a well-established government corner at the southeast corner of section 24 and ran north to the east quarter corner of section 1, also fully established, the distance corresponding closely with the government notes, and then by proportionate distances established the east quarter corner of section 13. He then ran a line from the southwest corner of section 24 to the northeast corner of section 14 in the same manner; and then started at the southwest corner of section 14 and ran north to the

west quarter corner of section 2 (located by testimony) and by proportionate distances located the west quarter corner of section 14. A straight line drawn from the east to the west quarter corner of section 14 as thus established shows the 15 acres in dispute to be within the north half of the southeast quarter. None of these corners except the first two mentioned gave unequivocal evidence of being government corners, such as the existence of mounds or pits, but stones were found at various places where the government notes indicated the corners had been located by the government surveyor, and the corners so taken by Green had never been disputed and had been acquiesced in by the owners for many years. We think the survey of Green was based upon correct principles and calculated to establish the original location of the corners as closely as possible. The defendant Wellman testified that as late as 1915 he had seen a mound and two pits about 12 or 13 rods south of the point where Green located the east quarter corner of section 14, and defendant claims that this established a government quarter corner at that point; but this was a question for the jury, and the witness Wellman was impeached by a number of witnesses called for that purpose. The northeast corner of section 14 is not in dispute. In fact, there is testimony to the effect that the defendant assisted in the locating of that particular corner, and using this corner in connection with the east quarter corner, established by Green, and extending the lines at right angles around the northeast quarter, gives defendant approximately 160 acres and 160 acres to the southeast quarter, which are the areas called for by the government notes; while, if defendant's position is correct, the northeast quarter would contain approximately 175 acres. Our references to the government notes are taken from the Green field notes and his testimony, as the government notes, while mentioned as an exhibit in the bill of exceptions, are not attached, and

many of the questions with reference thereto raised in defendant's brief on that account cannot be considered.

On this point defendant also urges error in the refusal of the court to give to the jury his fifth request, as follows:

"You are instructed that, in determining disputed boundary lines between land, testimony of a nonexpert or nonexperts that he or they saw and located the line from government corners then in existence may be accepted by you, if you believe their testimony in preference to that of surveyors who have subsequently located a different line independently of such government corners."

This is undoubtedly a correct statement of the law, but was sufficiently covered by instruction No. 6, as follows:

"The question in this case as to the true location of the boundary line between plaintiff's and defendant's respective lands is not how would an accurate survey locate these lands in question, but how did the orginal government survey and stakes locate them. The only purpose of the evidence of surveyors, who have made recent surveys, is to enable the jury to locate the original boundaries, if possible, and not for the purpose of determining where they ought to have been, or where they would have been by an accurate survey. The original starting points and boundaries are questions of fact for the jury to find from the evidence; not only the evidence of surveyors, but all other evidence in the case bearing upon these points.

"If you believe the evidence clearly establishes the location of the orginal government corners, you are instructed that the location of such government corners, no matter how erroneous or faulty they might have been, control over all subsequent surveys at variance thereto by whomsoever made. If you believe from the evidence that the boundary line of the strip of land in con-

troversy as claimed by defendant is in accord with the location of the original government corners, if such corners are clearly established by the evidence, then your verdict should be for the defendant."

On the whole, we find no prejudicial error in the instructions upon this branch of the case and are therefore bound to accept the verdict of the jury.

The third defense is adverse possession, the defendant claiming that he had been in the open, notorious, and hostile possession of the strip in question for ten years and more prior to the commencement of this suit. In relation to this defense the facts appearing from the record are substantially as follows: The defendant was the owner of the northeast quarter, and one Nettie Ferris of the north half of the southeast quarter, and sometime prior to March 1, 1909, defendant leased of Ferris the eighty belonging to her, said lease expiring the date mentioned. Defendant went into possession of the eighty under the lease, and subsequently built the boundary fence in dispute, which at first extended only about 120 rods, the remainder not being completed until 1911. Defendant testified several times that he did not claim any land not included in the northeast quarter, but also that he claimed up to the line of the fence. The plaintiff leased from Ferris beginning March 1, 1909, and did not become the owner of the land until 1916. Upon the expiration of the defendant's lease of the north half of the northeast quarter, he surrendered possession thereof to plaintiff, but the fence remained where it was along the southern boundary of the strip in dispute. Plaintiff testified that a constable told him that, on behalf of Ferris, he had served notice upon defendant in the fall of 1909 to remove the fence. Defendant moved to strike out this testimony as incompetent, and the motion should have been sustained, though the court overruled it. Then followed the injunction suit, upon the entry of the decree in which, May 21, 1918, the court having refused to fix a supersedeas bond, defendant moved the boundary fence

in dispute to the southern boundary of the northeast quarter, as found by the court, and did not replace it until April 27, 1920, when the decree in the equity suit was reversed. This action was begun May 28, 1920.

It will thus be noted that the dispute whether the fence was erected in 1905 or 1908 is immaterial; it was erected during the term of the lease under which defendant acquired possession. When defendant surrendered possession he retained that portion of the eighty which is in dispute; as to which, therefore, as between him and Ferris, he was holding over, and this relation of the parties continued until, by some unequivocal act upon the part of the defendant, his landlord, Ferris, received notice that he claimed title. The mere fact that he did not surrender possession was not such an act, because, such possession having commenced while defendant was a tenant of Ferris, he is presumed to continue in possession as a tenant; and the failure of the defendant to move the fence after notice by Ferris was as consistent with a claim as tenant as with a claim as owner.

In *Perkins v. Potts*, 52 Neb. 110, it was held: "One who takes possession of real estate as the tenant of another cannot hold said real estate adversely to his lessor without first having actually or constructively surrendered the premises to him."

In *Schields v. Horbach*, 49 Neb. 262: "A tenant by simply 'holding over' after the expiration of his lease does not hold adversely. Until he surrenders possession of the leased premises, or by some unequivocal act notifies the landlord that he no longer holds under the lease, he cannot claim that his possession is adverse."

In *Ross v. McManigal*, 61 Neb. 90, it was held: "Before a tenant can initiate an adverse holding and set the statute of limitations running in his favor, he must either yield up possession, or else distinctly repudiate the relation created by the lease and bring home to the lessor knowledge of the fact that the tenancy has been terminated."

In *Carson v. Broady*, 56 Neb. 648: "A tenant remaining in possession of the demised property after the expiration of his term, without any open or express repudiation of the relation created by the lease, is not, in contemplation of law, holding adversely to the owner, whatever may be his secret intention." And at page 651, the court, by Sullivan, J., said: "The relation of landlord and tenant was created by the lease. The defendants, until the answer was filed in this case, did not repudiate that relation or indicate by any clear and unequivocal act their intention to hold adversely. Under these circumstances their holding was not adverse, in contemplation of law, whatever may have been their secret purpose. Besides, at the time they obtained possession, they were, with the plaintiffs, tenants in common of the land. They were negotiating for the purchase of the plaintiffs' title; they recognized its validity then, and even as late as 1889 made application to buy it. They did no act at any time evincing an intention on their part, to oust their co-tenants; and they could not by a mere silent, peaceable possession, however long continued, extinguish the plaintiffs' title (citing cases)."

It seems to us the principles of these decisions control the case at bar. Ferris and her successors in title until 1916 were entitled to notice from defendant by some unequivocal act that he was claiming adversely; the acts or language of the plaintiff while he was a mere tenant of the land would not affect the title of the owners—he was not their agent for such purpose.

The defendant requested an instruction to the effect that, where a boundary fence had been acquiesced in by joint owners for the full period of limitations, the parties were estopped from claiming its incorrectness; this instruction was refused, and the defendant assigns error therefor. The ruling of the district court was correct. Defendant argues that inasmuch as plaintiff, while a tenant, erected a fence a few feet south of defendant's fence, and broke ground up to defendant's fence in 1909,

these acts constituted a recognition of defendant's fence as the dividing line. But, as just suggested, the tenant cannot bind his landlord by such acts; the owner alone, or his duly authorized agent is the only party who may be estopped in that manner. We therefore conclude that on the undisputed facts of this record defendant's possession was not adverse. We have examined with care the instructions of the district court, and find no error therein prejudicial to the defendant, and on the entire record conclude that the judgment should be affirmed, and it is so ordered.

AFFIRMED.