PAUL A. GOW,

*vs.*

CONSOLIDATED COPPERMINES CORPORATION, a corporation of the State of Delaware, THOMAS BARDON, CHARLES K. BLANDIN, SAMUEL BRENNER, JOSEPH B. COTTON, WILLIAM B. CRAVATH, WILLIAM S. GORDON, RAY W. HIGGINS, ROBERT D. HOFFMAN, NORMAN E. LAMOND and A. McC. WASHBURN.

*New Castle, Feb. 15, 1933.*

*Caleb S. Layton,* of the firm of Richards, Layton & Finger, and *Cravath, DeGersdorff, Swaine & Wood,* of New York City (*Robert H. Richards, Jr.,* of Wilmington, *William D. Whitney* and *R. L. Gilpatric,* both of New York City, and *D. S. Holmes,* of Duluth, Minn., on the brief), for petitioners.

*Christopher L. Ward, Jr.,* and *Arthur G. Logan,* of the

firm of Marvel, Morford, Ward & Logan, and *Joseph B. Cotton*, of New York City (*William S. Gordon*, of New York City, *John W. Neukon*, of Duluth, Minn., and *Samuel Brenner* and *Roy F. Wrigley*, both of New York City, on the brief), for respondents.

THE CHANCELLOR: 1. Was the number of directors lawfully increased from nine to fifteen? If the board was so increased in number, it was solely due to the amendment of the by-laws. The master found that this amendment was void and that therefore the six new directorates had not been created. He based his finding on the legal proposition that it was not permissible to effect a change in the number of directors of this particular corporation through a by-law amendment. His view was that as the charter of the corporation provided that the board should consist of nine members, the subject was beyond the jurisdiction of the by-laws; and that the only way the number could be changed was by an amendment of the charter—a procedure which no one claims was followed.

The master's view was that those matters which the statute permits to be defined and regulated in the certificate of incorporation or the charter, are, under the principle of gradation of authority referred to in *Gaskill v. Gladys Belle Oil Co.*, 16 *Del. Ch.* 289, 146 *A.* 337, beyond the reach of the inferior authority of the by-laws to change or alter. In any conflict between the charter and the by-laws with respect to a matter which the statute authorizes the former to deal with, he held that the by-laws must give way, even though they also are authorized by the statute to deal with the matter.

The charter provision touching directors is the same now as it was in 1922 when the corporation was formed. It is set out in the statement of facts. The original by-laws contained the same provision touching directors as did the charter, and in this respect both charter and by-laws

remained unchanged down to the date of the 1932 annual meeting of stockholders.

In 1922, when the corporation was formed, it is clear that the statute authorized the "fixing and altering the number of its directors" in the by-laws. *Section 2, par. 6,* of the act as it then existed [*Revised Code* 1915, § 1916 (6)]. That the number of directors might also be fixed in the certificate of incorporation is not so clearly evident under the act as it then existed. If the constitution of the board could in 1922 be provided for in the charter, justification for it, so far as the statute is concerned, must be found solely in two clauses then appearing in the act, viz., (a) the provision found in *Section 3* (*Revised Code* 1915, § 1917) that every corporation created under the act should, in addition to the powers enumerated in *Section 2* (*Revised Code* 1915, § 1916), possess *inter alia* "the powers * * * given in its charter or in its certificate under which it was incorporated, so far as the same are necessary or convenient to the attainment of the objects set forth in such charter or certificate of incorporation"; and (b) the provision found in *Section 5, par.* 8 [*Revised Code* 1915, § 1919 (8)], that "the certificate of incorporation may also contain any provision which the incorporators may choose to insert for the regulation of the business and for the conduct of the affairs of the corporation, and any provisions creating, defining, limiting and regulating the powers of the corporation, the directors and the stockholders, or any class of the stockholders; provided, such provisions are not contrary to the laws of this State."

These two provisions are the only ones appearing in the law in 1922 which lend support to the idea that the matter of fixing and altering the number of directors might be regulated in the charter, notwithstanding the act in *Section 2, par.* 6, expressly permitted that subject to be regulated in by-laws. Whether they warrant the view that directors and their number were properly the subject of

charter as well as by-law regulation, has never been passed on by the courts of this State. The master construed the provisions last referred to, which I may say are continued in the act to this day, to mean that the subject may be one which it is permissible to regulate in the charter. It is stated that such had always been the opinion of the bar. I shall, for the purposes of this case, accept that view as correct, though the point is arguable.

Accepting that view as correct, and assuming that no such change in the statute has, prior to 1932, been enacted as would alter it (a question which will be considered later) the master concluded that the superior authority of the charter overruled the by-law and must as a necessary corollary overrule any changed or altered by-law. With the accepted view as a premise, I think the master's conclusion was correct. *Gaskill v. Gladys Belle Oil Co., supra.*

But I cannot agree with the master's conclusion that nothing has occurred by way of legislative amendment of the act to destroy the premise from which his conclusion is deduced.

This brings us to a consideration of the amendment of 1929. That amendment did not disturb the old language of that portion of *Sections* 3 *and* 5 (8) referred to a moment ago, from which the authority of the charter to regulate the number of directors is supposed to have been derived.

The amendment of 1929 was to *Section* 9 of the act. That section in 1922 and down to 1929 provided that, "The business of every corporation organized under the provisions of this Chapter shall be managed by a Board of not less than three directors, except as hereinafter provided. \* \* \*" *Revised Code* 1915, § 1923.

The amendment of 1929 (36 *Del. Laws, c.* 135, § 4), so far as it is material in the present connection, altered the quoted portion of it so as to make it read as follows: "The business of every corporation organized under the provisions of this Chapter shall be managed by a Board of

Directors, except as hereinafter or in its Certificate of Incorporation otherwise provided. *The number of directors which shall constitute the whole board shall be such as from time to time shall be fixed by, or in the manner provided in, the by-laws,* but in no case shall the number be less than three." (Italics mine.)

This amendment to the law was operative on the Consolidated Coppermines Corporation, notwithstanding its creation antedated the amendment. *Davis, et al., v. Louisville Gas & Electric Co.,* 16 *Del. Ch.* 157, 142 *A.* 654. The master took the view that though the italicized sentence is phrased in mandatory terms, nevertheless it is to be construed as only directory in meaning. By this I understand him to mean that while the amendment appears in literal terms to make the by-laws the exclusive source of authority for defining the number which shall compose the directorate, yet the Legislature meant to confer only a permissive power on the stockholders who make and alter the by-laws [*Section* 12 ( *Revised Code* 1915, § 1926)] to specify in such by-laws the number of directors the corporation should have.

This is the pivotal point on which the present branch of the case turns. Does then *Section* 9 as amended in 1929 make the by-laws the sole and exclusive repository of the power to fix and alter the number of the directors? Certainly there is nothing in the nature of corporate structures which would render incongruous the notion that the matter of fixing and altering the number of directors should be the subject of final determination in the by-laws. Indeed the subject I think has been generally regarded as a particularly appropriate one to be committed to by-laws for regulation, because as the charter is an instrument in which the broad and general aspects of the corporate entity's existence and nature are defined, so the by-laws are generally regarded as the proper place for the self-imposed rules and regulations deemed expedient for its convenient functioning to be laid down. Our statute in its original as

well as in its present form is framed in harmony with this conception of the purpose which the by-laws are designed to serve.

Of course it is entirely competent for the Legislature to permit matters of internal government of a corporation created by it to be regulated in the charter. We are, for the purposes of this case, assuming that the Legislature did grant such permission under the act as it existed when this corporation was formed. At the same time, however, it is plain beyond all dispute that it also allowed the particular phase of internal government with which we are immediately concerned, viz., the fixing and altering the number of directors, to be set out in the by-laws.

Originally the power in the corporation to legislate upon the question of directors through the by-laws was not conferred in terms that expressly purported to be exclusive. Now, however, by the amendment adopted in 1929, the power of the by-laws to deal with the subject is couched in language which is imperative or mandatory in form. The language is—"The number of directors which shall constitute the whole board *shall be such* as from time to time shall be fixed by, or in the manner provided in, the by-laws." It is conceded on all sides that while the word "shall" is generally a word of mandatory import, it may under some circumstances be a word which is merely permissive in significance. The case of *Mayor & Council of Wilmington v. Barsky,* 5 *Boyce,* (28 *Del.*) 30, 90 *A.* 217, decided by the Superior Court of this State defines one rule for the construction of the word which I believe is accepted with uniformity. That rule is that where regulations are laid down for the conduct of public officers and the regulations prescribe that certain things shall be done, the language will be treated as mandatory if the regulation is intended for the protection of the person to be affected thereby; but where the regulation is merely for the guidance of the officer in the conduct of public business, the language

though imperative in form is only directory in character. The case of *Moon v. Moon Motor Car Co., et al.,* 17 *Del. Ch.* 176, 151 *A.* 298, is an application of the principle of the latter branch of that rule to a statutory direction for the guidance of corporate officers. I do not conceive that *Lippman v. Kehoe Stenograph Co.,* 11 *Del. Ch.* 190, 98 *A.* 943, affirmed 11 *Del. Ch.* 412, 102 *A.* 988, cited by the master, is of any material assistance in construing the effect of the word "shall" as it appears in the amendment. The word "shall" will be made to read as the equivalent of "may" if such construction is necessary to avoid the unconstitutionality of an act. *City of Des Moines v. Manhattan Oil Co.,* 193 *Iowa,* 1096, 184 *N. W.* 823, 188 *N. W.* 921, 23 *A. L. R.* 1322; *Reed v. Wellman,* 110 *Neb.* 166, 193 *N. W.* 261. As against the government, it has been held that "shall" is not mandatory unless the Legislature clearly intended it so to be. *Cairo & F. R. Co. v. Hecht,* 95 *U. S.* 168, 24 *L. Ed.* 423; *Anderson's Appeal,* 215 *Pa.* 119, 64 *A.* 443. In other cases, where a question of constitutionality is not dependent on the construction, it is ordinarily the rule that "shall" is presumed to have a meaning of command rather than of permission. *Rea v. Board of Aldermen of City of Everett,* 217 *Mass.* 427, 105 *N. E.* 618, *Ann. Cas.* 1915C, 1003; *Haythorn v. Van Keuren & Son,* 79 *N. J. Law,* 101, 74 *A.* 502, 504. "If a different interpretation is sought, it must rest upon something in the character of the legislation or in the context which will justify a different meaning." *Haythorn v. Van Keuren & Son, supra,* quoted with approval by the Court of Errors and Appeals of New Jersey in *Foley v. City of Orange,* 91 *N. J. Law,* 554, 103 *A.* 743.

Now I am unable to see anything either in the character of the legislation found in the 1929 amendment or in the context, which justifies the inference that the Legislature intended its use of the word "shall" to be taken in a merely permissive sense. Certainly there is no immediate context which justifies taking it in that sense. As

for the character of the legislation, I am of the opinion that the matter of directors is so generally accepted as the subject of by-law regulation that the character of the legislation, rather than indicating the language to have been meant to be taken as permissive, indicates the contrary as the more likely to be the fact.

It was just stated that there is nothing in the immediate context to suggest that "shall" in the amendment was used in any other than in its general sense of command. How stands the matter in the light of the more distantly removed context of the entire act? As already noted, the only other context discoverable anywhere in the act which can in any sense be said to shade the meaning of the word is found in *Sections* 3 and 5 (8), before referred to, which are in the same form now as they were before the corporation was created. Of these two sections, *Section* 5 (8) is the more important in the present connection. It provides that the certificate of incorporation, commonly called the charter, many "contain any provision which the incorporators may choose to insert for the regulation of the business and for the conduct of the affairs of the corporation." Prior to 1929, this provision of the act existed concurrently with *Section* 2 (6) which gave the corporation power to make by-laws fixing and altering the number of its directors. It has been assumed that in the light of these two sections a permissive power to fix and alter the number of directors was reposed in both the charter and by-laws. The non-imperative phraseology of *Section* 2 (6) lent countenance to this view.

But in 1929 the Legislature, without disturbing the two sections just referred to, wrote into *Section* 9 the provision that the number of directors "shall be such as from time to time shall be fixed by, or in the manner provided in, the by-laws." Now if this new language was meant to be only permissive and not imperative in meaning, what was the reason for its adoption? Why should the Legislature have taken the pains not only to re-bestow an already

existing permissive power in the by-laws, but as well to express it in such language as to cast doubt upon whether that which it was intending to confirm as permissive was in fact any longer so?

I am unable to attribute any satisfactory meaning to the phrase "shall be such" in the amendment of 1929 except that it was designed to effect a change in the law by *commanding* that the number of directors should be fixed in the by-laws (as distinguished from the theretofore assumed conception that the number *might* be fixed in the by-laws if desired), or in the manner therein provided.

The solicitors for the petitioner who speak for the Adee faction recognize the necessity for discovering some other purpose which the amendment was intended to serve if the one I have just stated is not to be accepted. Laboring under this necessity his suggestion is that the purpose was this: Before the amendment, there was a practice among corporate organizers to empower the directors themselves to change from time to time the number of the board, and the amendment was designed, he suggests, to break up that practice by "anchoring" the number of directors in the by-laws. This means that the amendment was meant to be imperative solely as against the resolution of the directors but not as against the charter. All that is advanced in support of this suggestion is the reported statement of the draftsman of the amendment. That, however, is not a satisfactory support. Furthermore, if the only purpose of the amendment was to break up the practice of allowing directors to fix their own number, the amendment failed to accomplish its supposed purpose, for as it permits the by-laws to provide for the manner of fixing and altering the number of directors and as the by-laws may be made subject to adoption, alteration or repeal by the directors [*Section* 12 (*Revised Code* 1915, § 1926, as amended by 37 *Del. Laws, c.* 129, § 4)], it is manifest that the amendment left it as possible for the directors to fix and alter their

number as it was before. The amendment cannot be accounted for as suggested by the solicitor for the petitioner, because it cannot be supposed that it was intended to break up a practice which its language failed to correct.

The master also recognized the necessity of evolving a purpose behind the amendment other than the new one of conferring on the by-laws exclusive control over the subject of fixing and altering the number of directors, if the imperative phraseology of the amendment's provision is to be interpreted as only permissive. The purpose which he suggested as having been meant to be served by the amendment was, he thought, to be found in the phrase "or in the manner provided therein." This phrase allows the by-laws, instead of themselves fixing or altering the number of directors, to provide some other manner of doing so. It is true that that is a new provision in the law. But I can see nothing in its nature which bears any logical relation to the question of whether the words "shall be fixed," which are equally new to the statute in the connection in which they are used, are words of command or of permission. If all that the Legislature meant to accomplish by the amendment was to confer power in the by-laws if desired to provide the manner of fixing the number of directors instead of themselves fixing the number, it would be reasonable to expect that the Legislature would have phrased its intention in a manner quite different from the way it did. I am unable to see how the desire of the Legislature to delegate the new power to the by-laws to provide a manner of fixing the number of directors argues that it could not have meant the language by which the general subject was committed to the by-laws for regulation, was less imperative in meaning than the ordinary sense of its phraseology would indicate.

I am compelled to disagree with the master's views on this point. My opinion is that the amendment of 1929 requires us to look to the by-laws exclusively for the final

word governing the number of directors for this corporation. This conclusion does no violence to the principle of gradation of authority spoken of in *Gaskill v. Gladys Belle Oil Co., supra.* It is entirely consistent with that principle, for the by-laws take their superior authority over the charter in this particular matter because they operate under the superior mandate of the statute.

It is undoubtedly true that the construction I have given to the amendment of 1929 makes it possible for the stockholders to effect a radical change in the personnel of the board of directors more expeditiously than they could if the number were a subject of regulation by the charter; it gives the stockholders also a control over the matter unrestrained by any opposition of the incumbent directors; for by-laws can be amended with less delay than can the charter and any proposed amendment to them does not have to be approved by the directors as must a proposed amendment to the charter. But this consideration is of no moment upon the question of construction. All that it can show is that the Legislature evidently regarded it as sound policy that the control of the corporation should at all times be subject to a fairly quick response to the wishes of the majority of its true owners.

When the master concluded that as a matter of law the number of directors could not be changed by an amendment of the by-laws but only by an amendment of the charter, it was unnecessary for him to take up the question of whether the attempted amendment of the by-laws was sustained by a proper vote. But he nevertheless considered that question and concluded that, if as a matter of law the number of directors could be changed through an amendment of the by-laws, the proposed change received the requisite number of lawful votes. The exceptions to his report filed by the petitioner and intervenors call for a decision upon that point, because, holding as I do that the

proposed amendment was lawful, I am required to proceed to a consideration of whether it was adopted.

2. Was, then, the amendment adopted by the necessary vote? The only issue made by the parties in this connection turns upon whether the votes of 641,398 shares, proxies for which were held by the Higgins committee, should have been counted in favor of the amendment. The objection to the votes of these shares is that the proxies representing them were secured from the respective stockholder-owners under circumstances that forbade their use in voting upon an amendment to the by-laws. The proxies were general. They authorized the attorneys therein mentioned (representatives of the Higgins faction) "to attend and vote" at the meeting "with all the powers the undersigned would possess if personally present." The notice of meeting which went out to the stockholders made no mention of a proposal to be passed on at the meeting for a change in the by-laws. This was natural, because the management in control contemplated no such change. The meeting being the annual one, however, no advance notice of a proposed change in the by-laws was required. The by-laws in article VII, section 1, are conclusive on that point. They provide that the by-laws may be amended "at any annual meeting thereof (stockholders), or at any special meeting thereof, provided notice of such proposed alteration, amendment or repeal be included in the notice of such *special* meeting." Under this by-law it was always in order at any annual meeting for the stockholders, without prior notice, to consider an amendment of the by-laws in any particular. When the stockholders gave general proxies to the Higgins representatives and placed no limitations upon the extent of the power conferred thereby, it must be assumed that the proxies were authorized to vote upon all matters that might come before the meeting in the ordinary and usual course. A proposal to amend the by-laws in any particular, in view of the quoted by-law, must be regarded as likely to arise in the

usual course. Upon this question of notice in advance of the meeting that a proposal would be submitted to amend the by-laws, the master properly distinguished the cases cited by the petitioner as not applicable. Those cases are *Bagley v. Reno Oil Co.*, 201 *Pa.* 78, 50 *A.* 760, 56 *L. R. A.* 184; *Moon v. Moon Motor Car Co.*, 17 *Del. Ch.* 176, 151 *A.* 298; *In re Griffling Iron Co.*, 63 *N. J. Law*, 168, 41 *A.* 931; *Id.*, 63 *N. J. Law*, 357, 46 *A.* 1097, and *Gold Bluff Mining & Lumber Corp. v. Whitlock*, 75 *Conn.* 869, 55 *A.* 175. In the first case, a statute indicated that a change in the directorate should be effected at a meeting called for the purpose, and the other cases dealt with special meetings.

The ground on which the petitioner and intervenors rest their objection to the acceptance of the votes of the 641,398 shares is that the proxies for those shares were secured by the Higgins committee not only (a) without a prior disclosure by the committee of the fact that they would be used for voting upon a proposal to enlarge the number of directors through amending the by-laws, but (b) by an act of fraudulent concealment of the full use intended to be made of the proxies, if not by circumstances showing positive deception. The master treated this aspect of the case under two headings and reported thereon as follows:

"*Limitation of authority in use of proxies given the Higgins Committee.*

"The various letters sent by the Higgins Committee solicited the support of the stockholders for the election of three directors. No specific mention of an intention to elect six new directors was made. Hence petitioner argues that the proxies given the Higgins Committee were in effect limited proxies and conferred no authority upon that Committee to vote in favor of the election of six new directors.

"These proxies were unrestricted in form. They conferred upon the attorneys named power 'to attend and vote' at the meeting 'with all the powers the undersigned would possess if personally present.'

"In substance what the petitioner is seeking to do is to limit the authority of a general power of attorney by statements made by the attorney to the stockholder prior to the execution of the instrument. In the absence of fraud, I do not see how this can be done. If a general proxy at a stockholders' meeting is to be limited by statements contained in letters soliciting proxies, great uncertainty and confusion would be introduced into corporate elections.

"In the case of *Hexter v. Columbia Baking Co.*, 16 *Del. Ch.* 263, 145 *A.* 115, the Chancellor said, in referring to the attempt of one Zabriskie, a member of the proxy committee, to destroy a quorum:

" 'The motive which actuated Zabriskie who spoke apparently not only for himself but as well for Tipton, sprung from the chagrin which he felt when he discovered that a majority of the attorneys-in-fact named in the proxies, of whom he was one, was going to vote the shares represented by them contrary to his wishes. He claimed that if the majority voted as they intended to do, it would be contrary to what he thought would be the wishes of the stockholders who had given the proxies. That, however, even if true would in itself constitute no good ground for protesting either the meeting's legality or the validity of its proceedings. When a stockholder gives an unrestricted proxy, as here, naming an attorney-in-fact to act in his stead, it must be presumed that what the attorney does in the proper exercise of the power conferred expresses the will of the stockholder. And where a majority of five attorneys is authorized to decide for the stockholder, the action of the majority carries with it a like presumption in its favor. *Smith v. San Francisco & North Pacific Ry. Co.*, 115 *Cal.* 584, 47 *P.* 582, 35 *L. R. A.* 309, 56 *Am. St. Rep.* 119; 2 *Thompson on Corporations*, (3d *Ed.*) *p.* 353; 3 *Fletcher, Encyclopedia of Corporations, p.* 2833.'

"The *Hexter Case* is of course quite different from the case at bar, but it seems to me that the principle there announced is applicable here. The stockholders gave unrestricted power to the Higgins Committee to vote their stock, and cannot now be heard to say that they did not.

"None of the cases cited by petitioner sustains his contention. In *Farish v. Cieneguita Copper Co.*, 12 *Ariz.* 235, 100 *P.* 781, it was held that a general proxy authorizes the transaction of 'corporate business' but not the rupture of the corporate contract. Likewise it was held in *Shield v. Lone Star Life Ins. Co.*, (*Tex. Civ. App.*) 202 *S. W.* 211, that a general proxy will not authorize a vote to sell all the assets and abandon the corporate business. *McClean v. Bradley,* (*D. C.*) 282 *F.* 1011, affirmed (*C. C. A.*) 299 *F.* 379, in effect holds

that all matters of corporate business are covered by a general proxy, and that a vote by proxy is as binding on the stockholder as his own vote, in the absence of fraud. In *Tilden v. Quaker Oats Co.,* *(7th C. C. A.)* 1 *F.* (2d) 160, it is said that the 'concealment of an intention to transact certain business at a shareholders' meeting is not a violation of any right of a shareholder who gives a proxy broad enough to transact the particular business complained of.' So far as the latter two cases are applicable, they are authority against the petitioner's contention.

"I am of opinion that, in the absence of fraud, the objection to the use of the Higgins Committee proxies on the ground that authority thereby conferred was limited to the election of three directors, must fail. This conclusion renders unnecessary a consideration of the depositions of certain stockholders offered for the purpose of showing that their proxies were intended as limited proxies.

*"Alleged fraud by the Higgins Committee in attempting to secure control of the corporation.*

"Petitioner, however, contends that by reason of the statements made by the Higgins Committee in the letters soliciting proxies from the stockholders, and by reason of the failure of that committee to inform the stockholders specifically of the committee's intention to amend the by-laws and secure control of the board of directors, a fraud has been committed upon the corporation and its stockholders. Petitioner further contends that the six Higgins directors, who were either members of the Higgins Committee or associated with it, participated in this fraud and were beneficiaries thereof, and hence their election as directors must be set aside.

"The pertinent facts relating to this phase of the case are as follows:

"At the annual meeting of the corporation in 1931 there had been opposition to the management from some of the stockholders. Some time prior to the 1932 meeting an opposition committee of stockholders, consisting of 55 members, was formed. The active members of this Committee, who actually conducted its affairs, were Messrs. R. W. Higgins, Joseph B. Cotton, C. K. Blandin, Thomas Bardon and William S. Gordon.

"On March 28, 1932, this committee sent to all stockholders a letter attacking the policies of the management and requesting the stockholders' support of the opposition proxy committee. This letter referred specifically to the fact that three members of the board of

directors were to be elected, and to the fact that the company's charter permitted the election of only one-third of the directors at any annual meeting. It was also said:

" 'While our candidates, if elected, will not control the Board, it is nevertheless certain that they will have a salutary effect on the conduct of the Company's business.'

"The letter described the management's policies as 'reckless and extravagant' and averred that the committee lacked confidence 'in the ability of the present management to meet the grave problems confronting the company.'

"On March 29 the management addressed a letter to the stockholders soliciting their support for the management proxy committee. This letter, after reviewing the condition of the company, referred to the 'attack upon your present corporate management' at the last annual meeting, and further stated:

" 'It is possible that before the next Annual Meeting the attack upon your officers and directors will be renewed and an effort will be made to raise again the issues which were decisively determined at our last Annual Meeting. Your present Board of Directors stand committed to the policies they then advocated and have since followed.'

"On March 28, the date of the first Higgins Committee letter, the idea that the by-laws might be amended to increase the board and thus permit a shift of control was not thought of. On April 3 or 4 the possibility of such action was suggested to Mr. Higgins by a Mr. Neukom, an attorney of Duluth. On April 8 Mr. Higgins, Mr. Bardon and Mr. Cotton discussed the matter. Mr. Higgins testifies that at this meeting nothing more was determined than that it was a possible course of action which should be investigated and discussed. Mr. Bardon testifies that Mr. Cotton said that he (Cotton) would look into the question, and that he (Cotton) wanted to discuss it with Mr. Gordon. Nothing further was done at the time, and no decision to adopt the plan suggested was reached until a meeting of the Higgins Committee in New York on the eve of the stockholders' meeting. Mr. Blandin testifies that he had no knowledge of the matter until he arrived in New York shortly before the meeting.

"On April 9, the Higgins Committee sent its second letter to the stockholders. It was drafted by Mr. Bardon. This letter contains a severe arraignment of the management and its policies. Some of the paragraph headings follow:

" 'The Present Financial Condition of the Company is very serious.'

" 'The Annual Report is Being Improperly Delayed.'

" 'Mistakes of Judgment.'

" 'Dummy Directors.'

" 'One-Man Management."

"The letter states that 'our right to representation is clear,' and that 'President Smith and his supporters are exerting themselves to the limit of their strength to prevent the reelection of one old director and two new ones.' Under the heading 'Who are Smith's Candidates' it was said: 'Nor has he announced his candidates for the three directorships.'

"The letter also contained this paragraph under the heading 'A Drastic Change is Necessary':

" 'If our Company is to survive the present depression, it is certain that radical changes in policy and management are essential. If, unhappily, a receivership is necessary, new directors must be ready to protect the interests of all the stockholders. If, by reason of your support, we are in control of the Annual Meeting, we will make as sweeping changes as are possible under the law and the Charter of the Company.'

"Mr. Bardon testifies that the above language was used by him in the light of the suggested possibility of amending the by-laws to increase the number of directors.

"On April 12, the management sent its second letter to the stockholders. This letter replied to the attack on the management policies contained in the Higgins letter of March 28, and urged the stockholders to support the candidates of the management for directors.

"On April 20 the Higgins Committee addressed a third letter to the stockholders, of nearly four pages.

"The management's policies were vigorously attacked, and certain statements of the management were asserted to be 'misleading' or 'untrue.' The letter, toward its close, said:

" 'The more we learn about the affairs of the Company the more convinced we are of the necessity of election of as many new directors as possible and the breaking up of the little clique which now dominates its affairs.'

"On April 21, the management sent its third and last letter to the stockholders. The tone of this letter evinces strong resentment against the attacks of the Higgins Committee letters and vigorously defends the management policies in considerable detail. Statements made by the Higgins Committee are asserted to be 'false', 'misleading', or 'malicious'. Referring to the sub-committee signing the Higgins Committee letter of April 9, it is said:

" 'Three of the members of this so-called sub-committee are Thomas Bardon, C. K. Blandin and R. W. Higgins, who for nearly two years have been carrying on a vicious and abusive campaign in an effort to secure control of your Company.'

"It was also said:

" 'We believe the other four individuals, as well as those who signed the communication of March 28, are merely misguided and are being used by the men above named without really appreciating the serious consequence if these men should gain control of your Company.'

"On April 27 the Higgins Committee sent its fourth and final letter to the stockholders. This letter replied to the management letter of April 21, and reiterated certain charges against the management policies. It was stated that the management letter 'gives only two reasons why our Candidates should not be admitted to the Company's Board of Directors.' The letter concluded with a statement of 'issues of vital importance,' among which was listed 'the election of a directorate which will give to the Company's business and affairs the required time and attention without thought of self-interest.'

"The Higgins proxy committee met in New York shortly before the meeting. After an ineffectual effort to compose their differences with the management, they resolved upon the course of action subsequently followed at the meeting.

"The petitioner charges that these facts show 'a deliberate and fraudulent purpose to conceal from the stockholders of the company generally the purpose which the Higgins Committee had in mind.' It is argued that the defendants were bound to communicate to the stockholders they were representing some knowledge of or information concerning it, and that the withholding of such knowledge amounted to constructive fraud. It is further argued that the use made of the proxies by the Higgins Committee was for their own advantage, because they procured the election of some of their own members and of their associates as directors of the corporation.

"In support of this contention petitioner cites the cases of *Rice & Hutchins v. Triplex Shoe Co.*, 16 *Del. Ch.* 298, 147 *A.* 317, and *Blair v. F. H. Smith Co.*, 18 *Del. Ch.* 150, 156 *A.* 207. In the first case the Chancellor held that a general proxy did not commit the principal to an act done by the agent 'solely in his own peculiar personal interest.' The Chancellor was there considering a case involving the ratification at an annual meeting of stockholders of a resolution purporting to issue stock to certain individuals for an illegal consideration, where the attempted ratification was based on the vote of a general proxy given to two of those same individuals. The *Smith Co. Case* presented a similar situation. In both of those cases the resulting injury to the stockholders is apparent.

"No such case is here presented. The law cannot presume that the election of any one group of directors is inimical to the interests of the stockholders or will result in injury to the corporation. Nor can the election as directors of some of the members of a proxy committee, and of others associated with such a committee, be fairly said to be, in itself, an act for their own personal profit.

"Moreover, I fail to find, in the facts above set forth, proof of any fraudulent purpose or conduct on the part of the Higgins Committee. The petitioner points to the language of the Higgins Committee of March 28, advising the stockholders that their candidates 'will not control the board,' and to certain excerpts from the succeeding letters, which it is said, make it clear that no honest attempt was ever made to apprise the stockholders of the plan then in mind.

"It may be said that the evidence fails to show the existence of any such plan, the matter not having, at the time of the later letters, progressed beyond preliminary discussions. In the letter of April 9 the stockholders were advised of the intention of the Higgins Committee to make 'as sweeping charges as are possible.' [The matter omitted, to quote the rest of this sentence, is, 'under the laws and charter of the Company,' which makes it more pointed.] This language fairly put the stockholder on notice that radical action was contemplated.

"In any event, I think this question should be viewed in a much broader way than the petitioner seeks to regard it. The series of letters of the two committees have been described. They are too long to attempt to quote here. A reading of them shows clearly, to my mind, that the Higgins Committee was conducting a vigorous and bitter attack upon the management of the corporation and announced to the stockholders its intention to do anything it could to curb the power of the management. If these letters are read as a stockholder

would naturally read them, they evidence, it seems clear to me, a bitter factional struggle—on the part of the management to prevent the acquisition by the Higgins Committee of any power, and on the part of the Higgins Committee to obtain all the power they lawfully could.

"The petitioner argues, in effect, that a stockholder who would be persuaded by these letters to accord to the Higgins Committee minority representation on the board, would not by any means agree to change the corporate control. This series of letters does not, it seems to me, support any such idea. The proxy campaign was not conducted on any such basis. The management letter of April 21, referring to the consequences of control by the Higgins Committee, negatives any such idea. The natural effect of the letters would be to make clear to the stockholders the serious factional struggle that was taking place.

"I conclude that the adoption of the by-law amendment increasing the number of directors of the corporation, and the election of six new directors to fill the place thereby created, should not be set aside on the ground of fraud."

I approve the master's findings as above set forth. A stockholder is bound to know what is apt to come before a meeting in the regular course. If he is not content to authorize his proxy to act generally in his stead upon all such matters, he should restrict the proxy's power by the instrument defining it. It will not do for a stockholder who executes a general, unrestricted proxy, much less for some stranger to the instrument, to come forward after it has been acted upon and seek to repudiate what the attorney did in execution of the instrument's plainly conferred powers, when the only intimation of alleged fraud consists of the fact that no one informed the stockholder that some particular piece of business appropriate under a pre-defined head might be put before the meeting. But even if this were not so, the letter of April 9th addressed to the stockholders whose proxies were sought, "fairly put the stockholder on notice," as the master observed, "that radical action was contemplated." The stockholders were thus advised that the proxies would be used in every way possible to wrest

control of the corporation from its existing management. Any stockholder who disapproved of that attitude should have withheld his proxy from the Higgins committee or, if he had already given one, should have revoked it.

3. The first test of strength between the two factions came on the question of approving the minutes of certain meetings and to approve reports of officers. The vote stood 600,135 for approval and 664,418 against. This vote was reported on May 10 by the inspectors to whom all proxies and ballots had been delivered on May 7. The inspectors spent three days hearing objections to proxies. They reported as stated on May 10. The meeting then proceeded to ballot for three directors to fill the expiring terms. The inspectors reported as elected—Higgins, Merritt and Bardon. Thereafter the Higgins group finding themselves in the majority, moved to amend the by-lays in the manner hereinbefore indicated. This motion precipitated a rather acrimonious discussion. A vote by ballot was demanded and the Adee faction declared its intention of re-examining all the proxies. A recess was taken until 2:45 P. M. On the reconvening of the meeting the inspectors received the ballots and withdrew to make the count. At about 4:45 P. M. the inspectors, without returning to the meeting, caused a letter to be delivered to the chairman stating that they had been engaged in undertaking to determine questions touching the qualifications of voters and the validity of proxies with respect to the votes cast upon the proposed resolutions of amendment; that it was evident that a re-examination of all proxies theretofore submitted would be necessary in order to determine to what extent such proxies authorized the holders to vote upon the resolution; and that they would sit at three o'clock on the next day (May 11th) to hear and determine the objections to the validity of proxies with respect to casting ballots for the adoption of the resolutions then before the meeting. The Higgins faction challenged the right of the inspectors to

pursue this course, put and carried a motion that a committee be appointed to find the inspectors and bring them with all ballots before the meeting. The committee was appointed over the protest of the Adee faction and reported at about 6:15 P. M. their inability to communicate with the inspectors or to learn their whereabouts.

On the receipt of this report, the motion was made "that the failure of the inspectors seasonably to count and report the ballots * * * be deemed to be a refusal to proceed with their duties * * * and that the chair, under the by-laws, appoint two inspectors in their place." The action of the inspectors went beyond the scope of their lawful authority. The master properly held that the office of inspector is a ministerial and not a judicial one. *C. J. vol.* 14a, *p.* 55; 3 *Cook on Corporations,* (8th Ed.) *p.* 2110; *Com. v. Woelper, et al.,* 3 *Serg. & R.,* (Pa.) 29, 8 *Am. Dec.* 628; *People v. Pease,* 27 *N. Y.* 45, 84 *Am. Dec.* 242; *In re Young v. Jebbett,* 213 *App. Div.* 775, 211 *N. Y. S.* 61. He further stated it as his opinion that the questions which the inspectors undertook to pass upon, particularly the question of whether the large number of general proxies running to the Higgins representatives empowered the holders to vote to amend the by-laws in the manner proposed, were questions of such a judicial nature as to be beyond the duties of the inspectors to pass upon. I concur in that view. The inspectors, instead of returning to the meeting and asking for instructions, in effect assumed to send word to the meeting to adjourn itself to some future day. I agree with the master in his conclusion that the conduct of the inspectors amounted to a failure to attend, if not a refusal to serve, and the situation therefore was one where the appropriate by-law operated which authorized the presiding officer to appoint substitutes. Two new inspectors were appointed, another ballot was taken and the proposed amendment was declared adopted. Six new directors were thereupon elected. The chairman announced

that the board of directors would convene immediately following the adjournment of the stockholders' meeting, as the by-laws provided it should, without notice or call. The stockholders finally adjourned their meeting at 9 P. M. the same day. A quorum of the enlarged board attended the meeting of directors immediately following the stockholders' meeting and elected officers. The title to office of these officers is one of the issues in the cause.

The first inspectors whose office had been declared vacant, proceeded with their hearings on the next day, the 11th. On the 12th the Adee faction undertook to reconvene the stockholders' meeting. The inspectors just referred to reported the proposed amendment to the by-laws to have been defeated by a vote of 24,870 for and 598,465 against. They rejected 641,398 votes because they erroneously concluded that proxies for those shares could not vote on the question.

The foregoing are the facts that bear on the question of whether the amendment to the by-laws was properly adopted. I think it was. The action of the first inspectors could not destroy the meeting. The absence of the voting list and the proxies, which had been in the meeting and which, because of the withdrawal of the inspectors, were no longer available, is of no importance. The proxies had been submitted and accurately counted at the outset of the meeting and no claim was made before the master that the absence of the voting list and the proxies was the cause of any injustice. So the master found, and such is the fact. In this connection he cited *Moon v. Moon Motor Car Co., et al.,* 17 *Del. Ch.* 176, 151 *A.* 298; *In re Zenithern Co.,* 95 *N. J. Law,* 297, 113 *A.* 327; *In re Schwartz & Gray,* 77 *N. J. Law,* 415, 72 *A.* 70. I agree with the master also in his view that under the circumstances shown the principle is applicable which was applied in *Re Cedar Grove Cemetery Co.,* 61 *N. J. Law,* 422, 39 *A.* 1024, viz., that when a stockholders' meeting breaks into two parts, it is reasonable to regard

the two as one for the purpose of determining the result of a vote, if that can be done without jeopardizing the accuracy of the result.

4. It is insisted that if the board was enlarged by the creation of six new places, it was improper for the meeting to proceed further to elect persons to fill the new places, and that another meeting should be called after notice for the purpose. The places were not vacancies and were therefore open to the stockholders to fill. *Moon v. Moon Motor Car Co., et al., supra.* The meeting was the regular annual one at which the election of directors was a stated order of business. While there was not express notification of the fact that new directorates would be created and immediately filled, yet no intelligent stockholder who attended to the debate conducted by the rivals through the mails could fail to understand that if the Higgins group prevailed, everything permissible under the statute and the law of the corporation would be done to wrest control from the existing management. The issue was the sharply drawn one of management vs. antimanagement. There are no special circumstances appearing in the case which suggest that this corporation should again be plunged into the midst of a bitter controversy between hostile factions over issues which have been the subject of recent and extensive debate. If any surprise was sprung by the Higgins committee upon any stockholder, it could not have been with respect to the goal at which the Higgins group aimed, but only with respect to the method of its attainment. Any stockholder who gave a general proxy to that committee must be presumed to have approved of the announced goal. It does not seem reasonable that another election should be held simply because the details of the plan by which the approved goal was to be reached were not announced in advance. I can discover no equitable considerations sufficient to warrant the view that the exercise by the majority of its lawful power should be frustrated and the old straw re-threshed.

I believe that in what precedes I have noticed all the points upon which the titles to office of the six new directors depend. My conclusion is that the by-laws were properly amended and that the election of the six new directors was lawful. The master's conclusion to the. contrary is not approved. The six new directors are Blandin and Gordon for the term of three years each; Cotton and Lamond for the term of two years each; and Brenner and Hoffman for the term of one year each.

5. The next branch of the case is concerned with this—who were elected to fill the terms of the three retiring directors? All the foregoing discussion in relation to the group of six new directors has no relation to the questions which this branch of the case presents. The master reported that Merritt, Higgins and Bardon were elected. Neither side is satisfied with the master's finding in this respect, and both have excepted thereto. The Adee faction claims that Merritt, Cravath and Washburn were elected; and the Higgins faction, that Higgins, Bardon and Cotton were elected. Thus, of those reported by the master as elected, the Adee faction makes an attack upon Higgins and Bardon, and the Higgins faction upon Merritt.

The controversy over these three places requires the court to pass upon the sufficiency of certain proxies as authority for the casting of votes for numerous blocks of stock. The questions relating to the proxies in controversy and the court's conclusions with respect thereto can be conveniently treated under the following heads.

(a) Partnership proxies. In each case the stock was registered in a partnership name such as, for example, "Alston & Co." The proxy was signed in longhand in the partnership name of the registered owner. The signature of the partnership did not show that it was by one of the individual partners. As a matter of fact the partnerships were firms of brokers. The master held that both factions in substance agreed to the allowance of such proxies as

proper and he took the view that it was not permissible, therefore, for either side now to object to their reception. But aside from that consideration, I think the proxies should have been recognized. The fact that no member of a firm signed his own name as the representative of all cannot serve to render the proxy invalid, where, as here, the authenticity of the proxy is not otherwise assailed. The respondents cite cases in support of their objection to the proxies which are concerned with the liability of partnership members upon bonds and mortgages which were executed in the firm name alone. The principle involved in such cases is of no pertinency in the instant one, for here we are not concerned with contractual obligations. The question is simply whether the firm authorized the person named in the proxy to act for it in the matter of voting its stock. It is a question of evidence only. When a firm in whose name stock is registered sends in a proxy signed in its name, it is reasonable to say that enough appears to give it the appearance of *prima facie* authenticity. The argument of the respondents goes so far as to require that the proxy be signed by every single member of the firm, or that evidence be produced, if only one member signs, that his co-partnership authorized him to act. Such a rule would import into the law of proxies the strict and formal exactions that are demanded before partnership obligations of the most solemn type can be established. If such were the rule the use of proxies in corporate elections would be hedged about by almost prohibitive restrictions. It would sacrifice practicability to mere form; and the securing of a quorum, which is already sufficiently difficult, would be rendered even more so. The practical considerations of business suggest that if a proxy is signed in the name of a partnership which is the registered holder of the stock, and the only criticism of it is that it was neither signed by all the members of the firm nor by one who affixes his own name as the representative of all, it

nevertheless is entitled to be taken as presumptively genuine.

(b) Corporation proxies. The master accepted these proxies for the same reason that he accepted the partnership proxies. It is not clear that there were any proxies from corporation owners. It is assumed that there may have been from the appearance of the words "and Co." after a name or names. Such proxies may have been from partnerships. But assuming that some were from corporations, in all cases the signature to the proxy corresponded to the name of the registered holder. I can see no reason for requiring the execution of a proxy in such case to be attended with all the formalities required for the execution of solemn corporate acts.

(c) Proxies from fiduciaries who are not stockholders of record. Both committees presented proxies from executors, administrators and guardians for shares registered in the names of the decedents or wards.

The petitioner contended before the master that proxies executed by the unregistered fiduciaries could not vote because *Section* 29 of the act (*Revised Code* 1915, § 1943, as amended by 36 *Del. Laws, c.* 135, § 15) provides that "the original or duplicate stock ledger shall be the only evidence as to whom are stockholders entitled to * * * vote in person or by proxy at such election" (referring to the election of directors).

The master properly held that this section is to be read in the light of *Section* 18 (*Revised Code* 1915, § 1932, as amended by 36 *Del. Laws, c.* 135, § 9), which is as follows: "Persons holding stock in a fiduciary capacity shall be entitled to vote the shares so held, and persons whose stock is pledged shall be entitled to vote, unless in the transfer by the pledgor on the books of the corporation he shall have expressly empowered the pledgee, to vote thereon, in which case only the pledgee, or his proxy, may represent said stock and vote thereon."

Under this section it is clear that a pledgor may vote the stock even though he is no longer the stockholder of record. Thus the rule of *Section* 29 is in one instance at least subject to an exception. So is it subject to an exception in the case of fiduciaries even though they do not stand on the stock ledger as stockholders. As the master pointed out, there could be no possible point in the statute's conferring the right upon fiduciaries to vote as it did in *Section* 18 unless it was intended that they could exercise that right without becoming stockholders of record, for if they became such they would possess the right otherwise by reason of *Section* 29. The master cited in support of his conclusion *In re Election of Directors of Cape May & Delaware Bay Navigation Co.,* 51 *N. J. Law,* 78, 16 *A.* 191, and *Elevator Supplies Co. v. Wylde,* 106 *N. J. Eq.* 163, 150 *A.* 347. They sustain his conclusion and I concur in it.

The master gave special consideration to a block of 20,000 shares standing in the name of Jennie S. Merritt. An additional block of 3,670 shares stood on the stock ledger in the name of a guardian for the estate of Jennie S. Merritt. The Acting Judge of Probate of St. Louis County, Minnesota, had found on September 29, 1926, that Jennie S. Merritt, who resided in the county, was unable and incompetent to care for and manage her property by reason of an impairment of her mental faculties, and he entered an order appointing the First National Bank of Duluth "guardian of the estate of the said Jennie S. Merritt." Another bank which succeeded the First National Bank as guardian, gave a proxy to the Higgins committee not only for the 3,670 shares, but as well for the 20,000 shares which still stood in the name of Mrs. Merritt. The Adee committee produced a proxy from Mrs. Merritt for the 20,000 shares. The question arose as to who could vote the 20,000 shares. The master held that the proxy from the guardian prevailed over the one from the ward. Conceding that an adjudication of mental incompetency is not conclusive, yet the master held that once insanity is established it is presumed to continue until the

contrary be shown, citing *Duffield v. Morris' Ex'r.*, 2 *Har.* 375; *Frazer v. Frazer*, 2 *Del. Ch.* 260, 263; and *McAllister v. Rowland*, 124 *Minn.* 27, 144 *N. W.* 412, *Ann. Cas.* 1915*B*, 1006. Nothing having been shown to overthrow the presumption, the master rightly concluded that the guardian could vote all of the Merritt stock.

(d) The Logan stock. This stock numbered 63,000 shares and was registered in the name of Josie H. Logan, Stuart Logan and Illinois Merchants' Trust Company, Trustees. The three trustees gave two open proxies, one for 60,000 and one for 3,000 shares to the Adee committee. The committee tendered its proxies to the inspectors, and voted all the stock for which it held proxies. Stuart Logan, one of the trustees, was present at the meeting in person. He received a telegram from his co-trustees, Josie H. Logan, advising him to vote for the Adee ticket, and a telegram from the bank, the other trustee, reminding him that any two of the three trustees had authority to act. He cast a ballot representing 60,000 as trustee, and, as a member of the Adee proxy committee, another ballot for all the shares represented by that committee, which included not only the 60,000 shares but the other 3,000 shares of the Logan stock. The inspectors decided that the personal presence of Stuart Logan, one of the Logan trustees, revoked the two proxies which had been given by the three trustees, and counted all the Logan shares as having been voted by Stuart Logan in his capacity as trustee.

The respondents insist that the Logan stock was not lawfully voted. The master refused to uphold them in this contention. I think he was right. If Logan could not vote the stock, then the Adee proxy committee which held proxies executed by all the trustees could. It will not do to say that trustees cannot delegate the purely ministerial power of voting stock held in this manner. There is no justification in this record for the view that the trustees in executing the proxies did anything other than to appoint an attorney

to record their joint vote. Every piece of evidence bearing on the question shows that the Adee proxy committee carried out the wishes of the majority of the trustees.

(e) Proxies sent by telegrams. It is not necessary for me to pass on the propriety of allowing proxies in the form of telegrams, because, in the light of the foregoing lettered headings, neither the acceptance nor rejection of these so-called proxies can affect the result of the election.

I am in receipt of a joint letter from the solicitors in the cause which I shall take the liberty to file as a stipulation (reserving the right of either side to object) which sets forth the various contingencies of result according as they would follow from the acceptance or rejection of the points hereinbefore discussed under the lettered headings.

It is sufficient simply to announce that the views I have accepted result in confirming the master's report that Higgins, Merritt and Bardon were elected as the successors to the three retiring directors.

6. Finally who are the officers of the corporation? The master found them to be Howard B. Smith, President, George T. Adee and Carleton E. Merritt, two Vice-Presidents, and E. J. MacDonald, Treasurer. This finding followed from his conclusion that the board of directors had not been increased, for if the existing board was not increased in number the rival claimants to the offices who trace their election from the increased board can of course have no just titles to the respective offices.

Not having accepted the master's findings on the question of the increasing of the board, I am required to proceed to consider whether the board as enlarged properly elected Higgins, Blandin and Bardon as president, vice-president and treasurer respectively.

In order to make plain the question involved in this phase of the case it is necessary to make a brief recital of facts. It will be remembered that shortly after the three directors were declared elected at the stockholders' meeting

as successors to the retiring group, the bitter controversy was injected over amending the by-laws. The meeting recessed until 2:45 P. M. In the interval of the recess, it is claimed, the six old directors and the three who had just been elected then constituted the board, the by-laws not then having been amended. During the recess a quorum of this number met and elected as officers Smith, Adee, Merritt and MacDonald. That action is the basis of their claims to their respective titles to office. It appears to be disputed as a fact that the election was held as claimed. But if it be conceded, yet I am of the opinion that the pretended election was in vain.

This is for the reason that the by-laws provide that "the Board of Directors shall hold its first annual meeting for the year immediately after the annual stockholders' meeting, or immediately after the election of Directors at such meeting." When the so-called meeting of directors was held during the recess, the annual stockholders' meeting had not adjourned. A motion was pending to amend the by-laws by providing for six additional directors, and if the motion carried, it would have been in order immediately to fill the six new places. In a very real sense, the stockholders had not concluded their business of settling upon the directors who were to conduct the corporate affairs for the coming year. The spirit of the quoted by-law is to the effect that the first annual meeting of the directors should not be held until the personnel of the board for the ensuing year should be finally and definitely determined. The meeting, therefore, at which Smith and his associates were elected was premature. It was of no effect.

I conclude that the meeting of the enlarged board of directors held after the final adjournment of the stockholders' meeting was the first lawful meeting of the board and that the officers elected thereat are the lawful officers of the corporation. The master's report that Smith, Adee,

Merritt and MacDonald are the duly elected officers is not approved.

Decree in accordance with the foregoing.