Gerald S. PARSHALLE and Michael S. Ariens, Petitioners,

v.

Real O. ROY and Quinn W. Martin, Respondents.

Real O. ROY and Quinn W. Martin, Counterclaim Petitioners,

v.

Gerald S. PARSHALLE and Michael S. Ariens, Counterclaim Respondents,

v.

REALIST, INC., a Delaware corporation, Additional Counterclaim Respondent.

Civ. A. No. 10937.

Court of Chancery of Delaware, New Castle County.

Submitted Sept. 1, 1989.
Decided Sept. 19, 1989.

Thomas A. Beck, and Anne C. Foster, of Richards, Layton & Finger, Wilmington, Michael Fischer and Maureen A. McGinnity, of Foley & Lardner, Milwaukee, Wis., for petitioners and counterclaim respondents.

Lawrence A. Hamermesh, Brett D. Fallon and Robert J. Valihura, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, and Nutter, McClennen & Fish, Boston, Mass., for respondents and counterclaim petitioners.

## OPINION

JACOBS, Vice Chancellor.

This action was commenced on June 27, 1989, pursuant to 8 *Del.C.* § 225, by petitioners Gerald S. Parshalle ("Parshalle") and Michael S. Ariens ("Ariens"). Petitioners seek a declaration that they were duly elected as directors of Realist, Inc. ("Realist") at Realist's annual shareholders meeting held on June 6, 1989. On July 11, 1989, respondents Real O. Roy ("Roy") and Quinn W. Martin ("Martin") filed their answer and counterclaim seeking a declaration that they, rather than Parshalle and Ariens, were duly elected as directors of Realist at that meeting. This is the decision of the Court after expedited discovery, briefing, and a final hearing on the merits.[1]

### I.

The pertinent facts are not disputed. Described in this section are the essential background facts. Recited in the sections that follow are the facts that relate specifically to the parties' specific claims.

---

1. Because the record is entirely documentary, the hearing took the form of an extended oral argument, as opposed to a trial involving live testimony.

Realist is a Delaware corporation having its principal offices in Menomonee Falls, Wisconsin, and is engaged in the business of manufacturing micrographic systems and technology equipment for certain optical and electronic surveying instruments. Realist common stock is publicly traded on the over-the-counter market and is quoted on the NASDAQ system.

Parshalle has been Realist's President and Chief Executive Officer, and has served on its Board of Directors, since 1977. Ariens is the president and chief executive officer of an outdoor power equipment and snowblower manufacturer, and has served on Realist's Board of Directors since 1980. Realist's Board members serve staggered terms. The terms of Messrs. Parshalle and Ariens expired at the annual shareholders meeting on June 6, 1989. Those two gentlemen were the "management" nominees for reelection at that annual meeting.

Respondents Roy and Martin were the candidates nominated by the Royal Business Group ("Royal") to oppose Parshalle and Ariens. Royal is a holding company that has expressed an interest in acquiring Realist. Mr. Roy is Royal's president and chief executive officer, and Mr. Martin is an attorney with a Milwaukee law firm that serves as counsel to Royal.

The incumbent management and the Royal Group conducted opposing proxy solicitations on behalf of their respective candidates. Nonetheless, the two opposing factions, acting through Royal and Realist, were able to agree upon certain "rules of the game." Their accord was embodied in a formal "Agreement Governing Conduct" for the 1989 stockholders meeting (the "June 6 Agreement"). That document, which was executed on June 6, 1989, set forth procedures to govern the conduct of the meeting and the voting of shares. The June 6 Agreement also contained a comprehensive list of presumptions (the "Presumptions") that would govern in resolving any disputes over the validity and effect of proxies.

The annual shareholders meeting was convened on June 6, 1989, and remained in session until all attending stockholders had the opportunity to cast their ballots. The meeting was then adjourned until the final tabulation of votes was announced.

On June 7, 1989, representatives of First Wisconsin Trust Company, which served as the inspector of elections (the "Inspector"), met with representatives of Realist and Royal to discuss the preliminary tabulation of votes. That tabulation indicated that Ariens and Parshalle had been elected. Because the parties identified certain errors in the tabulation, they agreed that the preliminary tabulation would be withdrawn. Thereafter, on June 9, 1989, the Inspector released a revised preliminary tabulation that indicated that the Royal slate, Messrs. Roy and Martin, had been elected by a small margin.

On June 13 and 14, 1989, representatives of Realist and Royal presented and responded to challenges to the Inspector's tabulation of certain proxies. On June 16, the Inspector issued its ruling on the challenges and its final report, which declared that Messrs. Roy and Martin had been duly elected as directors. The Inspector's report announced the following voting results:

| Name of Nominee | Number of Votes |
|---|---|
| Real O. Roy | 291,864 |
| Quinn W. Martin | 290,364 |
| Michael S. Ariens | 280,898 |
| Gerald S. Parshalle | 278,118 |

At the reconvened stockholders meeting on June 16, 1989, the Chairman of Realist's Board accepted the Inspector's report, subject to the right of either party to challenge the Inspector's determination under Delaware law. This action followed.

II.

The petitioners, Parshalle and Ariens, advance two distinct proxy challenges. The first concerns a proxy of Fundamental Investors, Ltd., a Florida limited partnership ("Investors"), voting 6,000 shares of Realist stock in favor of Roy and Martin. The petitioners claim that the person who executed that proxy on Investors' behalf had

no authority to do so and that, therefore, the Inspector erred as a matter of law in counting that proxy.

The petitioners' second proxy claim concerns "datagram" proxies submitted on behalf of Fundamental Resources, Ltd. ("Resources") and Fundamental Associates, Ltd. ("Associates"). Resources and Associates each hold of record 6,000 shares of Realist common stock. Petitioners contend that the Inspector erroneously counted those 12,000 combined shares as having been voted in favor of Roy and Martin, because the datagram proxies are invalid as a matter of law. The datagram proxies are claimed to be invalid because (i) they do not comply with the requirements of 8 *Del.C.* § 212(c) and Realist's by-laws, and alternatively, (ii) because of the procedures utilized to obtain and prepare the datagram proxies, those proxies lack the indicia of authenticity and genuineness needed to accord them a presumption of validity. That claim, if upheld, would invalidate the election of Roy and Martin.[2]

The petitioners contend that if the Court were to reject both of their contentions, it must uphold the Inspector's determination that Roy and Martin are the duly elected directors. The respondents contend that if one or both of the petitioners' proxy challenges is upheld, the Court must address the respondents' counterclaim.

The thrust of respondents' counterclaim is that the entire election must be invalidated because it was procured by materially misleading disclosures in the "management" proxy solicitation. The respondents argue that the "management" proxy statement violated the directors' fiduciary duty of disclosure, because it omitted two critical facts: (i) that Realist was then negotiating, and had previously executed a letter of intent, to acquire a Swiss company named Ammann Laser Technik, AG ("ALT"), and (ii) that only five days before the election, Parshalle and another Realist

director had each purchased 13,000 shares of Realist stock and, pursuant to the same agreement, had received proxies to vote those shares. That 26,000 share purchase increased Parshalle's ownership of the outstanding Realist shares from 3.8% to 6%, and increased management's collective ownership by over 4%, to a total of 26% of the outstanding shares.

For the reasons now discussed, I conclude that: (a) the petitioners' claim that the Investors' proxy is invalid must be rejected, (b) the petitioners' claim that the datagram proxies are invalid must be upheld, and (c) because of the nature of the relief to be granted in respect of the petitioners' datagram proxy claim, namely, the ordering of a new election, it is unnecessary to address the respondents' counterclaim.

### III.

#### A.

The facts essential to the petitioners' challenge to the Investors' proxy are straightforward. On or about May 23, 1989, Realist received a proxy that voted Investors' 6,000 shares in favor of Ariens and Parshalle. That proxy had been executed on Investors' behalf by Marius A. Robinson, one of Investors' two general partners. On June 2, 1989, Realist received a second proxy, executed on behalf of Investors by Carl M. Singer, who is the chief executive officer of Investors' other general partner. That second proxy voted Investors' Realist shares in favor of Roy and Martin. Because both proxies were submitted on behalf of the same registered owner and voted an identical number of shares, the Inspector concluded that the later proxy revoked the earlier one. Accordingly, the Inspector decided to count the later-dated proxy executed by Mr. Singer, which voted Investors' 6,000 shares in favor of Messrs. Roy and Martin.

---

**2.** That is because a ruling in petitioners' favor would reduce the margin of votes cast in favor of Roy and Martin by 12,000 votes, and would place those votes in the Parshalle/Ariens column. The petitioners are willing to concede that if the respondents' datagram proxies are found invalid, then so, too, would be the datagram proxies cast in their (petitioners') favor. (TR. 9/1/89, p. 25). The Court is advised that datagram proxies representing approximately 8,400 votes were cast in favor of the petitioners.

Petitioners challenge that determination, arguing that Mr. Singer had not been authorized in these peculiar circumstances to execute a proxy on behalf of Investors. Affidavits submitted during this litigation establish that while Mr. Singer was authorized to conduct the day-to-day activities of Investors and to address routine matters, the Investors' partnership agreement prescribed that if the general partners disagreed on matters relating to Investors, Mr. Robinson's decision would control. The affidavits also establish that the later-filed proxy was submitted as the result of a misunderstanding (or, more accurately, a failure of communication) between these two partners. At the time he executed the June 2, 1989 proxy, Mr. Singer did not know that Mr. Robinson had previously submitted a proxy voting Investors' shares for Ariens and Parshalle. Mr. Singer states that, had he known that fact, he would not have submitted the June 2 proxy voting for Messrs. Roy and Quinn. Mr. Robinson, in his affidavit, represents that it was and is his intention that the Realist shares be voted for Messrs. Ariens and Parshalle.

These facts form the basis of petitioners' claim that the Inspector erred as a matter of law in crediting the June 2 proxy executed by Singer. Having considered the petitioners' position, I conclude that the claim must be rejected.

## B.

I start with the undisputed fact that each proxy was submitted on behalf of the same record holder (Investors), and purported to vote the same number of shares. Moreover, each proxy was regular on its face; specifically, neither bore any facial indication that the person executing the proxy was unauthorized. Therefore, both proxies were entitled to a presumption of validity. *Atterbury v. Consolidated Coppermines Corp.*, Del.Ch., 20 A.2d 743, 747 (1941); *Standard Power & Light Corp. v. Investment Associates, Inc.*, Del.Supr., 51 A.2d 572, 580 (1947). Faced with two identical proxies having differing dates, the Inspectors correctly gave effect to the la-

ter-dated proxy—a result mandated both by Delaware case law, *Standard Light & Power*, 51 A.2d at 580, and by the parties' June 6 Agreement. *See* June 6, 1989 Agreement, Presumption No. 3. That an internal mistake or misunderstanding among Investors' general partners may have led to the later-dated proxy, is not a fact of which the Inspector or this Court may take cognizance. *Williams v. Sterling Oil of Oklahoma, Inc.*, Del.Supr., 273 A.2d 264, 265 (1971); *Blasius Industries, Inc. v. Atlas Corporation*, Del.Ch., 564 A.2d 651 (1988); *Concord Financial Group, Inc. v. Tri State Motor Transit Co.*, Del.Ch., C.A. No. 10984, Holland, J., 1989 WL 102484 (September 6, 1989) (appeal pending).

In *Williams, supra*, the Supreme Court held that even where an otherwise valid proxy is submitted in error, the power of the Inspector, and of this Court, to correct such errors is limited:

We agree, of course, that the correction of clerical mistake should be favored over disenfranchisement; but not at the price of uncertainty of procedure, impractical delay in election results, or possible invitation to fraud. The policy favoring correction of mistake must be limited to corrections that can be made from the face of the proxy itself or from the regular books and records of the corporation.

273 A.2d at 265.

In *Williams*, a brokerage firm simultaneously submitted two proxies, each signed by the same person, and each reflecting the same number of shares but casting inconsistent votes. The inspector of elections subsequently received the signatory's affidavit explaining that she had not been authorized to execute one of the two proxies. The inspectors and this Court relied upon that affidavit and gave effect to the other proxy. *Williams v. Sterling Oil of Oklahoma, Inc.*, Del. Ch., 267 A.2d 630, 632–33 (1970). The Supreme Court reversed, holding that the affidavit should not have been considered:

[I]nspectors of an election must reject all identical but conflicting proxies when the

conflict cannot be resolved from the face of the proxies themselves or from the regular books and records of the corporation.

273 A.2d at 265.

*Williams* clearly controls this case. Here, as in *Williams*, the mistake cannot be corrected from the face of the proxies or the corporation's regular books and records. Nor does this case fall within the narrow class of situations where evidence extrinsic to those sources may be considered, namely, where the challenged vote is claimed to be a result of fraud or breach of duty. *Blasius Industries, Inc. v. Atlas Corporation, supra,* 564 A.2d at 668, 670.[3]

The petitioners argue that *Williams* is not controlling because in *Scherer v. R.P. Scherer Corp.,* Del.Ch., C.A. Nos. 10204 & 10205, Allen, C., 1988 WL 103311 (October 5, 1988), this Court looked behind the proxies and considered extrinsic evidence to determine a shareholder's authority to execute a proxy. However, *Scherer* does not depart in any legally pertinent way from the *Williams* principle. The issue in *Scherer* was whether inspectors of election had properly refused to count shares that had been voted by proxy, where the voting of those shares had been stayed by an order of a Michigan court. The inspectors of election, who had notice of that order, determined not to count the votes represented by those shares. This Court held that the inspectors had acted appropriately in giving effect to the Michigan court order.

The *Scherer* opinion does not rest upon the body of law governing proxy voting. Rather, *Scherer* was decided explicitly upon principles of injunction law and comity. *Scherer* does not announce, nor can it fairly be read to stand for, the rule of law petitioners attribute to that decision. The inspector of elections in *Scherer* was bound *by law* to consider and give appropriate effect to an injunctive order that had been issued by a court of competent jurisdiction and that concerned whether certain shares could be voted. In reviewing that determination, this Court was likewise required to take cognizance and determine the effect of that order. Petitioners' effort to read into *Scherer* the broad exception to *Williams* that they advocate here, is alien both to *Scherer's* underlying facts and to its articulated rationale.[4]

## C.

■ The above analysis of Delaware case law does not, however, resolve this particular proxy challenge. The petitioners argue, in the alternative, that the parties' June 6 Agreement expressly allows extrinsic evidence to be considered in connection with challenges to authority to execute a proxy on behalf of a partnership. Presumption No. 12 of that Agreement provides that a proxy that votes shares registered in the name of a partnership and

---

3. The *Williams* precept was recently applied in *Concord Financial Group, Inc. v. Tri–State Motor Transit Co., supra.* In a carefully written opinion deciding a § 225 action involving numerous, discrete proxy challenges, this Court, *inter alia,* upheld the decision of inspectors of election rejecting proxies that, because of an admitted clerical error, had been copied on only one side. Relying on *Williams,* Justice Holland (sitting by designation) held that because the clerical error could not be corrected from the face of the proxy itself or the books and records of the corporation, the inspector acted properly in refusing to count those proxies. *Id.,* at 30–32.

4. This is not to say that reliance upon extrinsic evidence is proscribed in all circumstances. Our case law is to the contrary. Where a vote is claimed to have resulted from the commission of a fraud or breach of fiduciary duty that goes to the very integrity of the election process, this Court may consider such extrinsic evidence as may be relevant to prove the fraud or breach of duty. An example would be a claim that the signature on a proxy is forged. Long before it decided *Williams,* the Supreme Court recognized that this Court may entertain such a claim. *See Standard Power & Light Co.,* 51 A.2d at 580. That result furthers one of the policy goals of the *Williams* rule, which is to prevent fraud. 273 A.2d at 275. However, the circumstances where extrinsic evidence may be considered are quite narrow and circumscribed. In *Blasius Industries, Inc. v. Atlas Corporation,* this Court stated that "judges of election (and reviewing courts *absent fraud or breach of duty* ) are not to inquire into [a record owner's] intention except as expressed on the face of the proxy consent, or other ballot." *Blasius, supra,* 564 A.2d at 668 (emphasis supplied). *See also id.,* 564 A.2d at 670.

signed in the partnership's name by a general partner or other person purporting to act with authority, "... is presumptively valid in the absence of satisfactory evidence that the signature was made without authority." The petitioners argue that they presented satisfactory evidence of Mr. Singer's lack of authority to the Inspector, who erroneously refused to credit that evidence. That contention, however, is unsupported by the record.

The only evidence presented to the Inspector was a letter from petitioners' counsel, stating in pertinent part that:

"Representatives of the Company were advised by Mr. Robinson on several occasions, including just prior to the Company's Annual Meeting, that Mr. Robinson possesses *sole* authority to vote the shares of Company Stock held by ... Investors, that such shares could only be voted from California where Mr. Robinson resides, and that it was his intent to vote such shares "For" the Company's slate of directors and "Against" the stockholder proposal...."

Carlson Aff., Exhibit B, at 4.

While counsel's advice may have served to give formal notice · of the petitioners' legal position, it did not constitute "satisfactory evidence" that Mr. Singer signed the proxy without authority. Counsel's advice was hearsay and factually incorrect. The statement that Robinson possessed the sole authority to vote Investors' Realist shares was not accurate. In fact, Singer was also authorized to vote those shares on Realist's behalf, except where Messrs. Singer and Robinson did not agree. In that case Mr. Robinson's wishes would prevail. The Inspector was not informed of that internal partnership arrangement or that there even existed an internal disagreement that would have brought that dispute resolution mechanism into play. Accordingly, insofar as the petitioners' claim is based on the June 6, 1989 Agreement, it lacks a sufficient factual foundation.

Therefore, the Inspector acted properly in counting the June 2, 1989 proxy casting Investors' 6,000 votes in favor of Messrs. Roy and Martin.

## IV.

### A.

The petitioners' second proxy claim focuses specifically upon two datagram proxies, both dated June 2, 1989 and both purporting to vote a combined total of 12,000 Realist shares held by Resources and Associates in favor of Messrs. Roy and Martin. The nature of the petitioners' attack, however, makes it evident that, in reality, they challenge all of the "datagram" proxies solicited and obtained by the respondents.

In general terms, a datagram proxy is a procedure in which a record shareholder, by using a toll-free telephone number, is able to communicate his vote in telegraphic or "datagram" form. The practice of using telegraphic proxies, which are also commonly described as "proxygrams" or "datagrams", appears to have become widespread among professional proxy solicitors. *Concord Financial Group, Inc. v. Tri-State Motor Transit Co., supra,* at 44–45, *citing* 5 Fletcher, *Cyclopedia of the Law of Private Corporations,* § 2056 at 311 (rev. perm. ed. 1987); E. Aranow & E. Einhorn, *Proxy Contests for Corporate Control* 416 (2d ed. 1968), and Doty, *Tabulating Proxies at Meetings of Stockholders,* 24 Bus. Lawyer at 891 (1969). The specific procedures used to solicit telegraphic proxies often vary from case to case.

In this particular case the respondents' datagram proxy solicitation procedure was designed and executed by Morrow & Company ("Morrow"), the respondents' proxy solicitation firm, assisted by Telecommunications Industries, Inc. ("TII"), a proxy support service organization. Morrow contacted Realist shareholders of record and provided them with a toll-free number that they could call to register their votes. The toll-free number was to TII's West Virginia facility, which was staffed by telephone operators specially employed to process such calls.

In accordance with Morrow's instructions, TII operators would ask callers a series of questions designed to elicit (i) the caller's voting instructions, (ii) the share-

holders' name, address, city, state, zipcode and telephone number, (iii) the number of shares being voted, and (iv) whether the shares were being voted by an individual or a corporation. Morrow did not request, nor did TII obtain, any other identifying information from callers.[5]

As TII's operator received that information from the caller, the operator entered the information on a computer terminal. That information was then converted to a "proxy format," that is, to the specific form of proxy utilized by the Royal group, and thereafter was transmitted electronically to Morrow's office, where it was printed out in "datagram" form and delivered to the corporation.

After completing this process, TII's operators did not telephone the shareholder-caller to confirm the shareholder's identity or vote. Nor would telephone records have enabled TII to confirm the caller's identity, because the telephone bills received by TII with respect to the toll-free number did not identify the source of the calls made to that number and TII had no other records of incoming calls.

### B.

■ The petitioners urge this Court to invalidate the challenged datagram proxies on two distinct grounds. The first is that datagram proxies fail to satisfy the requirements of 8 *Del.C.* § 212 and of Realist's by-laws which (petitioners contend) mandate that a proxy be "executed" by the record stockholder. Secondly, and in the alternative, the petitioners argue that because of the absence of procedures to permit verification of the identity of the caller and the genuineness of the proxy voting instructions, the respondents' datagram proxies lacked sufficient indicia of authen-

ticity and genuineness to be treated as presumptively valid.

These contentions raise questions of first impression in Delaware. Challenges to the validity of datagram proxies have been made in at least two prior cases, *Wincorp Realty Investments, Inc. v. Goodtab, Inc.*, Del. Ch., C.A. No. 7314, Brown, C., 1983 WL 8948 (October 13, 1983) and recently in *Concord Financial Group, Inc. v. Tri-State Motor Transit Co., supra,* but on both occasions the question was not decided because it was not outcome determinative. Here, however, the issue could be outcome determinative because of the number of votes represented by datagram proxies.

Because it is unnecessary to do so, the Court does not address the validity of datagram proxies in general or on statutory grounds. Rather, the Court confines itself to the petitioners' second contention, which focuses upon the particular datagram proxies utilized here. On the basis of common law (as distinguished from statutory) principles, the Court concurs in the petitioners' argument that the datagram proxies submitted by respondents lack the fundamental indicia of authenticity and genuineness needed to accord them a presumption of validity. That conclusion does not rest upon the procedural deficiencies in the respondents' manner of preparing their datagram proxies. Rather, it rests upon the fact that the datagrams lack any written signature or signature equivalent (such as a signature stamp or facsimile), or other identifying mark or characteristic that would verifiably link the proxy to a specific shareholder of record. As a consequence, it cannot be presumed that that shareholder consented to the agency relationship that the respondents' datagram proxies purport to evidence.[6]

---

5. In other solicitations, some corporations assign a confidential identification number to each shareholder of record, and TII operators are directed to ask the caller for that number before processing the caller's vote. That procedure was not followed here.

6. The respondents contend that any challenge to the validity of datagram proxies is contractually precluded by Presumption No. 8 of the June 6

Agreement, which provides that a "proxy which has been transmitted by ... datagram ... shall not be deemed invalid, due to the method of transmission." That contractual waiver is inapplicable, because the claimed deficiency in the datagram proxies does not concern the method of their transmission, but, rather, the absence of information on the face of those instruments that is needed to accord them presumptive validity.

## C.

Delaware, like other jurisdictions throughout the country, permits a shareholder to vote by proxy. *See* 8 *Del.C.* § 212. A "proxy" or "proxy card" is merely written evidence of an agency relationship in which a principal (the shareholder of record entitled to vote) authorizes an agent (the person designated on the proxy card) to vote the principal's shares with respect to the matters and in the manner specified in the proxy. *See Duffy v. Loft, Inc.,* Del.Ch., 151 A. 223, 227, *aff'd* Del.Supr., 152 A. 849 (1930). Because a proxy serves to enable a shareholder to cast his vote through a surrogate without being physically present himself at the stockholders' meeting, the integrity of the entire proxy voting procedure necessarily and implicitly rests upon the premise that the agency relationship is genuine and, correlatively, that the proxy instrument accurately and reliably evidences that relationship.

 Accordingly, even though Delaware law does not prescribe a particular "form" of proxy, *See Gow v. Consolidated Coppermines, Corp.,* Del.Ch., 165 A. 136 (1933), a proxy, whatever form it may take, must possess at least this fundamental attribute: to be accepted as valid evidence of an agency relationship, the proxy must evidence that relationship in some authentic, genuine way. Proxies meeting that fundamental requirement will enjoy a presumption of validity. *Cf. Standard Power & Light Corp. v. Investments Assoc. Inc., supra;* R. Balotti & J. Finkelstein, *The Delaware Law of Corporations and Business Organizations,* (1988) ¶ 7.15.

 What is needed for a proxy to meet that requirement? The authenticity and genuineness of a proxy are normally established by the stockholder affixing his signature on the proxy, either in writing, or by a signature stamp or facsimile which have come to be regarded as signature equivalents. The presence of a signature or signature equivalent is significant not in and of itself, but because of what it represents. The act of placing one's signature on a legal document, whether in writing or by a facsimile or stamp, is regarded as the most deliberate, conscious way that a person may manifest his intent to consent to, and be bound by, the terms of that document. While facsimile or stamped signatures are not the same as a written signature, all three are identifying marks which by their nature, and absent fraud or breach of duty, would have originated only from the stockholder-principal or someone acting on his behalf. Thus, a particular stockholder's signature or equivalent identifying mark on a proxy is a manifestation of assent that justifies that proxy being treated as presumptive evidence that that shareholder agreed to create the agency relationship described therein. To say it in different words, the requirement that a proxy be genuine and authentic is presumptively satisfied by the presence of a signature or signature equivalent on the proxy.

This is not to suggest, however, that a signature (or signature equivalents) are the only possible or permissible indicia of genuineness and authenticity.[7] In this age of technological innovation, it must be assumed that other methods exist, or will be developed, to evidence in some verifiable way that the proxy and the instructions thereon are authentic (*i.e.,* originated from the stockholder-principal) and genuine (*i.e.,* accurately reflect his wishes).[8] Thus, the question is whether the datagram proxies utilized here by respondents bore any indicia of authenticity and genuineness, such as a signature, signature equivalent, or other identifying mark, that would justify

---

7. Unless, of course, the universe of possible indicia is limited by statute. In *Carey v. Pennsylvania Enterprises, Inc.,* 876 F.2d 333, 342 (3rd Cir.1989), (Sloviter J. concurring), Judge Sloviter concluded that a datagram proxy could not survive the mandate of Pennsylvania's corporation statute which expressly requires that a proxy be "executed," 15 Pa.Stat. § 1504(A).

8. For example, some corporations issue to each record stockholder a confidential identification number that must appear on the face of the proxy and that presumably is not available to unauthorized persons. In the case of a datagram proxy, the shareholder must disclose the identification number to the telephone or telegraph operator before the proxy will be processed.

treating those proxies as presumptively valid. These proxies do not: they contain no identifying mark evidencing, in some verifiable way, that the proxies originated with, and reflect the wishes of, the record stockholder whose name is set forth in the same typewritten print used in the text.

That finding does not rest upon any evidence extrinsic to the proxy itself. But even if it were assumed, without deciding, that the Court is free to consider extrinsic evidence on this particular issue, such evidence only confirms the respondents' inability to verify the authenticity and genuineness of their datagram proxies.

It is uncontroverted that Morrow and TII did not employ procedures that would have enabled them or anyone else to verify that a person who called the toll-free number to cast a vote on behalf of a particular shareholder was, in fact, the record shareholder or someone authorized to act on his behalf. The limited identifying information given by the caller to TII's operator was available from sources other than the record stockholder. Such information could be obtained from the Realist shareholders' list, which was made available to representatives of both sides. TII's operators did not telephone the shareholders to confirm the callers identities, and TII's telephone records did not identify the source of the toll-free calls. Finally, TII did not utilize procedures that would minimize or avoid the risk that a datagram might not accurately reflect the caller's intentions.[9]

Accordingly, neither TII nor anyone else possessed the ability to verify that the datagram proxies were valid at the time they were prepared. Nor is the respondents'

submission of after-the-fact affidavit testimony attesting to the proxy-granting shareholder's intention, a sufficient answer. The accuracy of such testimony cannot be tested in this case. Because callers were not furnished with confirming copies of datagrams, they have no contemporaneous written record of the datagrams. Moreover, it is conceivable that a shareholder might want to change his vote after the polls were closed. It is also possible (at least in theory) that such a shareholder might be persuaded to adopt an unauthorized datagram purporting to vote his shares. Had either scenario occurred in this case, the procedures employed by Morrow and TII would have made such an occurence virtually impossible to detect.

For these reasons, the datagram proxies prepared by Morrow and TII, and voted in favor of respondents, must be declared invalid. Because petitioners' concede that their datagram proxies must be treated identically, (See supra, p. 22, note 2) those proxies are declared invalid as well.

## V.

■ The final question is what relief appropriately flows from that declaration. The petitioners contend that as a consequence of its datagram proxy ruling, the Court must declare Ariens and Parshalle as Realist's newly elected directors. Respondents disagree. They contend that the Court must next address their counterclaim asserting proxy disclosure violations. They further contend that if their disclosure claims are upheld, management's proxy solicitation must be invalidated and a new election must be held.

---

9. The experience of First Wisconsin Trust Co., shows that that risk was more than theoretical. Apparently at the suggestion of Morrow, a representative of First Wisconsin called the TII toll-free number and advised the operator that First Wisconsin, acting on behalf of Heartland Value Fund, wished to revoke a proxy voting the Fund's 26,000 shares in favor of Roy and Martin. The operator informed First Wisconsin's representative that to do so, First Wisconsin would have to submit a new proxy. The operator then recorded First Wisconsin's voting instructions as a "withhold authority" for Roy and Martin, but did not tell First Wisconsin's representative that by so doing, under the terms of the Roy/Martin proxy, all earlier proxies cast by First Wisconsin would be revoked. Because First Wisconsin had previously executed a proxy voting the Fund's shares in favor of Ariens and Parshalle, the "withhold authority" indication on the datagram proxy revoked the very proxy to which First Wisconsin desired to give effect. Ultimately, when those facts surfaced, the Inspector counted the 26,000 shares as voted for management and the respondents withdrew their challenge to that proxy. (TR. 9/1/89, at 82).

For the reasons now discussed, I conclude, solely as a consequence of ruling that the datagrams are invalid and without regard to the respondents' counterclaim, that the appropriate remedy is a new election. That is the relief to which respondents claim to be entitled if they prevail on their counterclaim. Because that relief will be granted on independent grounds, the respondents' disclosure claims need not be addressed.

In these circumstances, if the Court were to invalidate the datagram proxies, without more, the result would be to disenfranchise all Realist stockholders who voted by datagram, none of whom had any reason to doubt the validity either of their vote or of voting by datagram. The number of shares represented by datagram proxies is sufficiently large to alter the outcome of the election. Because the Court's ruling will effect a change in proxy voting procedures that Realist's shareholders had no reason to anticipate, the only fair and equitable remedy is to order a new election. *See Dynamics Corp. of America v. CTS Corp.*, 643 F.Supp. 215, 222 (N.D.Ill.1986).

Counsel shall submit a form of order consistent with the rulings herein.