[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiffs in this action are a group of shareholders known as the Committee to Protect Shareholders CT Page 2670 ("the Committee") who challenged the election of the slate of directors proposed by Management ("Management").
On September 18, 1989, the annual meeting of shareholders of the Great Country Bank ("Great Country"), a Connecticut stock corporation with its principal place of business in Ansonia, was held for the election of five directors, the appointment of auditors and such other business that lawfully came before the meeting. The bylaws of Great Country provide for the election of five directors annually who hold office for three years on its 15 member board.
A description of the proxy solicitation and voting process is necessary to an understanding of this law suit. Plaintiffs and defendants are not in dispute as to how this process works.
Shares of stock can be acquired and held in the name of the real owner. In that event, the owner's name appears on the Bank's shareholder list, and he, or in the case of an institution, an authorized representative, is the only one entitled to sign a proxy appointing one or more persons to vote his shares. He has full control over how the shares are voted by proxy; and there can be no third party mix-ups when the shares are so held.
Instead of giving a proxy, an owner whose shares are held in his own name may attend the shareholders' meeting and vote directly. Even if such a record owner has given his proxy to others, he can revoke it at any time prior to the vote. Thus, he can sign a later proxy (which would supersede an earlier one, Gen. Stat. Conn. section 33-336 (d)), or he can appear and vote in person at the meeting. Such personal vote at the meeting has the effect of revoking any earlier proxies he may have given.
Owners of stock sometimes choose to acquire and/or hold stock not in their own names but through a brokerage house or other financial situation. In that case the customer is referred to as the "beneficial owner". Stock owned by a beneficial owner but held by a brokerage or banking institution is said to be held in "street name". The use of street name-ownership complicates the proxy and voting process and introduces risks not present where a shareholder holds stock in his own name.
Even the brokers and financial institutions that hold shares for their clients often are not themselves the "record holders". With a view toward reducing paperwork and CT Page 2671 facilitating transfers of stock, many such institutions participate in an arrangement by which their clients' shares are deposited with The Depository Trust Company, in which case CEDEFAST, a related company to CEDE Co., a partnership acting on behalf of The Depository Trust Company, is named as "record holder" of the stock. Shareholder lists of publicly held corporations typically show CEDE Co. as record holder of a substantial number of shares. In this case, it was stipulated that as of the record date of August 9, 1989, Great Country had issued and outstanding 2,194,221 shares, 1,840,917 of which were issued in the street name of CEDEFAST.
Pursuant to federal regulations the Bank is required to notify banks and brokers of the meeting date and record date so that the banks and brokers can conduct a security position search. Under such circumstances, CEDE Co. then forwards to the secretary of the Corporation a "Security Position Listing" setting forth the meeting date, the record date and a listing of the total number of shares that, on the record date, each participating broker or financial institution has on deposit with The Depository Trust Company. Accompanying that document is an "Omnibus Proxy" by which CEDE Co. appoints each entity on the Security Position Listing its proxy to vote the number of shares listed opposite the entity's name.
The corporation is required by FDIC regulations, 12 C.F.R. § 335.203 (C), to furnish sufficient sets of proxy materials to each entity identified in the Security Position Listing and each other broker or institutional holder to enable each to transmit the proxy materials to the beneficial owners for whom it acts. Smaller local banks may also "piggyback" on regional banks who, in turn, "piggyback" on participating CEDE banks. The result is that there may be as many as four or five layers between the beneficial owners and the record holder, CEDE.
As a practical matter, the corporation's responsibilities to inquire as to the number of proxy statements needed and to furnish the appropriate number of sets of proxy materials to such entities are carried out by the corporation's proxy solicitors. In the present case, these functions were performed by Great Country by its proxy solicitors, Morrow Co. The Carter Organization was performing similar tasks for the Committee.
Responsibility for determining and implementing the voting desires of each beneficial owner rests with the entities identified in the Security Position Listing. Where CT Page 2672 the beneficial owner has retained the right to instruct the broker or financial institution how the shares are to be voted, each such entity must then communicate with each beneficial owner for whom it acts; and customarily it will endeavor to execute a proxy for the appropriate number of votes in whatever manner the beneficial owner directs. The beneficial owner can also give the broker or financial institution the power in its discretion to vote the shares on behalf of the beneficial owner.
The financial institution can sign a proxy to have all of the shares it holds voted in one way or it can sign two or more proxies to vote a portion of the shares one way and other portions in different ways. In summary, the broker or financial institution may (a) own all or part of its shares itself; (b) hold on behalf of such owners; or (c) hold on behalf of beneficial owners who have retained the right to provide voting instructions to the bank or financial institution. When a shareholder holds his shares in street name, only the bank or broker can execute the proxy.
May of the banks and brokers contracted with a company called Independent Election Corporation of America ("IECA") to communicate with beneficial owners to obtain voting instructions others performed this communication process themselves.
In uncontested elections, few problems ordinarily arise concerning interpretation of proxies signed with regard to stock held in street name. Where an election is contested, however, both sides either directly or through proxy solicitors are in frequent communication with beneficial owners seeking to have them cause their shares to be voted, in whole or in part, for one side or the other. Such communications continue after the proxies have been once signed; and, since proxies are revocable, the beneficial owner can request changes right up until the time of ballot.
Because beneficial owners may change their minds one or more times in this process, the institutional holders, (financial institutions and brokers) tend to wait until just prior to the election to send in their proxies. Where the use of street names requires that such changes be made through intermediaries (such as the entities identified on the Security Position Listing), there exists a risk of error.
What is being challenged in this case is the interpretation of the Connecticut National Bank/Society for Savings Proxy ("CNB/SFS Proxy"); the Provident National Bank/Dimensional Fund Advisers Proxy ("Provident/DFA Proxy") CT Page 2673 and the Suffield Bank/Shawmut Bank Proxy ("Suffield/Shawmut Proxy").
The Bank appointed three of its own employees as inspectors of the election. The Bank made the appointment of the inspectors pursuant to its bylaws. The Committee had earlier requested to have independent inspectors from a professional company.
On September 26, 1989, the inspectors informed the Committee that four directors from the management slate (Bassett, Buckley, Bustelos and Quinn) and one director from the Committee slate (Von Seldeneck) had been elected (hereinafter called "the split slate"). On September 28, 1989, the Committee submitted a written challenge to the inspectors claiming they improperly tabulated three large blocks of shareholder votes, which should be properly counted to elect all five of the Committee candidates.
However, on October 3, 1989, the inspectors issued a written report confirming the election of the split slate. On that same date, the bank issued a press release announcing that it would not seat Von Seldeneck as a director pending a review of his group's possible violations of Federal Banking Laws.
The inspectors were appointed and informed by the Bank Management to take their technical advice if needed from Morrow Company ("Morrow").
Inspectors were told to use the following criteria for voting ballots: (a) look for the date of the last voted proxy; (b) look to determine the record holder and number of shares; (c) whether signed by an authorized person; and (d) look for share amount and to vote all shares of record holder if no share amount is indicated.
The inspectors were informed how to use the IECA sheets. Each side submitted the IECA sheets.
The inspectors all testified at trial that they had made their decisions as to the CNB/SFS Proxy, the Provident/DFA Proxy and the Suffield/Shawmut Proxy before speaking with Morrow people who had gone to the counting room where all ballots were kept under lock and key in a truck by McGladrey Pullen, the accounting firm which had been hired by the Bank to oversee the security of the election documents.
All the inspectors testified that there was no interaction between them and the Morrow people and all their CT Page 2674 decisions were made independently.
The inspectors did not go beyond the evidence in the trunk. The inspectors did not try to determine the intent of the person signing the ballot. The inspectors did not seek intent of beneficial shareholders. The inspectors used the same standards of last date to vote shares of institutional votes whether for the benefit of the Committee or Management. The inspectors did not seek extrinsic evidence to interpret the challenged proxies.
Under the amended complaint the plaintiffs seek pursuant to section 33-315 of the Connecticut General Statutes to have the court compel Great Country's management to seat as directors the five committee candidates they claim were duly elected by the shareholders.
More specifically, plaintiffs G. Clay Von Seldeneck, Geoffrey McGrath, Douglas Olson, Mark Staples and Daniel Adams (the five independent candidates) and Snyder, Von Seldeneck, Rorer Partners, L.P. (a shareholder) are suing defendants Great Country Bank, Edward Miller (chairman of the board of the bank), Craig Sullivan, Kathryn Kidd and Scott Smith (the election inspectors employed by the bank), and William Bassett, Joseph Buckley, John Bustelos, Frederick Quinn and Donald Clemons (the incumbent management candidates who currently serve as directors of the bank).
Plaintiffs have filed a six count complaint alleging:
I. Improper tabulation of the Connecticut National Bank vote (the "CNB" proxy);
II. Improper tabulation of the Provident National Bank shares (the "Provident" proxy);
III. Breach of fiduciary duty-(by the bank's management);
IV. Improper voting of the Shawmut Bank shares (the "Shawmut" proxy);
V. Improper refusal to seat Von Seldeneck; and
VI. Manipulative, deceptive and unfair conduct by bank management.
Plaintiffs ask that this court order the defendant Great Country to rescind the election results and install the five Committee candidates as the duly elected directors of the CT Page 2675 bank, pursuant to Connecticut General Statutes section 33-315.
The defendants argue that the court cannot and should not consider the challenged proxies on broad equitable grounds under section 33-315.
The defendants assert that even if the corporation had actual knowledge of the facts claimed by the plaintiffs. Section 33-311a entitles the corporation and inspectors to act as they did.
The court shall now discuss the challenged proxies as well as the other counts of the complaint.
I. The CNB/SFS Proxy
Three proxies were filed on behalf of or bearing the signature of CNB: (1) a proxy to "Steve Smith — Society for Savings", limited on its fact to 39,000 shares, bearing a date of September 13, 1989, issued by The Independent Election Corporation of America on behalf of CNB (Ex. 1006P) ("CNB #1"); (2) a proxy to the Committee's proxy agents limited on its fact to 95,500 shares, signed by CNB, bearing a date of September 13, 1989 (Ex. 1005P) ("CNB #2") (this proxy also bore the signature of "William M. Griffin", a general partner of OL Ltd. Partnership; and (3) a proxy to management's proxy agents, not limited to any number of shares, signed by CNB, bearing a date of September 18, 1989 (Ex. 1007P) ("CNB #3") (this proxy also bore the signature of "Stephen Smith, Sr. V.P. Society for Savings").
Apart from the above-described proxies, all the inspectors had before them pertaining to the CNB vote were the record holder list of 8/9/89 ( Ex. 1001P) showing CEDEFAST as record holder of 1,840,917 shares and the CEDE Omnibus proxy showing that CNB could vote 141,600 shares (Ex. 1014P).
From the documents before them, the election inspectors concluded that the CNB #3 proxy which was signed and duly executed by CNB, voted all 141,600 shares for the split slate.
Plaintiffs challenge this tabulation claiming that the inspectors credited toward the split slate not only the 39,000 shares held for SFS, but also (1) the 95,500 shares held for the OL Limited Partnership (a strong supporter of the Committee on behalf of which a proxy authorizing a vote for the full Committee-backed slate had previously been submitted), and (2) the remaining 7,100 shares held by CNB for beneficial holders other than SFS or the OL Limited CT Page 2676 Partnership (on behalf of which no proxy at all had been submitted). Plaintiffs argue that if the CNB proxy submitted on behalf of OL Limited Partnership had been properly tabulated, all 95,500 shares would have been credited for the five directors supported by the Committee.
The court finds that the inspectors properly tabulated the CNB proxies in accordance with the Connecticut law, which states:
 Unless the proxy otherwise provides: It covers all shares in respect of which the person executing the same is entitled to vote or act. . . . [Furthermore] the corporation may treat any duly executed proxy as not revoked and in full force and effect until it receives a duly executed instrument revoking it, or duly executed proxy bearing a later date. . . .
Conn. Gen. Stat. section 33-336 (1989) (emphasis added).
In the case at bar, the court finds that the tabulation of CNB #3 (a duly executed proxy bearing a later date), as revoking the earlier proxies and voting all of the shares (because it did not otherwise provide) was mandated by law. Stephen Smith, the authorized person for executing the ballot for SFS knew CNB had to sign the proxy #3, and submitted it to CNB. The authorized person for CNB made the mistake because she was in a hurry and did not limit the proxy vote to SFS shares.
The inspectors cannot seek extrinsic evidence to determine intent of the beneficial owners or correct mistakes.
While there is no relevant Connecticut case law interpreting these statutes, the court looks to Delaware case law for guidance on questions of corporate law, as it is the forum where the majority of such issues are litigated.
As in Connecticut, the last dated proxy controls:
 Faced with two identical proxies having differing dates, the Inspectors correctly gave effect to the later-dated proxy — a result mandated . . . by Delaware case law . . . . That an internal mistake or misunderstanding among Investors' general partners may have led to the later-dated proxy, is not a fact of which the Inspector or this Court may take cognizance. Williams v. Sterling Oil of Oklahoma, Inc., Del. Supr., 273 A.2d 264, CT Page 2677 265 (1971); Blasius Industries, Inc. v. Atlas Corporation, Del. Ch., 564 A.2d 651 (1988); Concord Financial Group, Inc. v. Tri State Motor Transit Co., Del. Ch., 567 A.2d 1 (1989).
Parshalle v. Roy, Del. Ch. 567 A.2d 19, 23 (1989).
The Delaware courts have even held that where proxies have identical dates the later post-marked proxy controls, even though it may not in fact be the later-executed proxy. Concord, 567 A.2d at 9, n. 14.
The Delaware rules, and the policies behind them are set out in Blasius, Del. Ch. 564 A.2d 651, 668-69 (1988) (citations omitted) as follows:
 The multilevel system of beneficial ownership of stock and the interposition of other institutional players between investors and corporations (e.g., IECA or brokers whose customers hold stock beneficially) renders the process of corporate voting complex . . . . In reviewing the computating of the outcome of a proxy fight or a consent contest, the law does not inquire into the subjective intent of either the record owner or the beneficial owner in the usual case. A legal test that made inquiry into the subjective wishes of ultimate owners relevant would, of course, threaten to convert every close proxy fight into protracted and costly litigation. The law has avoided that risk while attempting to preserve a credible claim to corporate democracy by announcing the rule that only record owners are entitled to vote and if any investor chooses to hold his stock in some fashion other than his own name, he thereby assumes the risk that involving intermediaries will entail . . . . Moreover, even as to record owners, the administrative need for expedition and certainty are such that judges of election (and reviewing courts absent fraud or breach of duty) are not to inquire into their intention except as expressed on the face of the proxy . . . . This rule is dictated by the necessity for practical and certain procedures in the fair handling of proxies and the expeditious conclusion of corporation elections. The policy favoring correction of mistake must be limited to corrections that can be made from the face of the proxy itself or from the regular books and records of the corporation. The acceptance and consideration of extrinsic evidence for the CT Page 2678 purpose, especially when questioned and controverted . . ., improperly take the inspectors over the line from the realm of the ministerial to that of the quasi-judicial.
For the foregoing reasons judgment may enter for the defendants on the first count.
II. The Provident/DFA Proxy
Similar to the CNB scenario, three proxies were filed by or on behalf of Provident: (1) a proxy to the Committee's proxy agents limited to 174,500 shares bearing a date of September 15, 1989 issued by The Independent Election Corporation of America on behalf of Provident and bearing the signature of Kenneth W. Akeson, attorney-in-fact (Ex. 1004D-1) ("Provident #1"); (2) a proxy to the Committee's proxy agents limited to 26,900 shares bearing a date of September 15, 1989 and bearing the signature of Kenneth W. Akeson, attorney-in-fact (Ex. 1015P) ("Provident #2"); and (3) a proxy to management's proxy agents signed by Provident National Bank, not limited to any number of shares, bearing a date of September 18, 1989 (Ex. 1016P) ("Provident #3") (this proxy also bears the notation "For DFA").
Again, apart from said proxies, all the inspectors had before them were the record holder list and the CEDE Omnibus proxy showing that Provident could vote 201,400 shares.
From the documents before them, the election inspectors concluded that Provident #3 revoked all prior proxies and voted all of Provident's shares for the management slate. (Testimony of Craig Sullivan, Kathy Kidd and Scott Smith).
Plaintiffs challenge this tabulation, claiming that the Inspectors improperly credited toward the split slate not only the 26,900 shares held by Provident for DFA, but also Provident's remaining 174,500 shares held for SVR Partners and RTP Ltd. Partnership. Ironically, this resulted in the 65,000 shares beneficially owned by SVR Partners, a member of the Committee, being voted for the split slate which included four management-backed candidates. It also resulted in the 109,500 shares held by Provident for RTP Ltd. Partnership, a strong and vocal supporter of the Committee, being voted for the split slate. Plaintiffs argue that if the Provident proxy submitted on behalf of the non-DFA beneficial owners had been properly tabulated, all 174,500 shares would have been credited for the five directors supported by the Committee. CT Page 2679
However, the court finds that the tabulation of Provident #3 (a duly executed proxy bearing a later date) as revoking all prior proxies and voting all of the shares (because it was not otherwise limited to a specific number) was mandated by Conn. Gen. Stat. section 33-336, supra. The plaintiffs' claim that the inspectors improperly tabulated the Provident shares fails and judgment enters for defendants as to the second count.
In the defendants' post-trial reply brief it stated the following:
"The inspectors based their report on what the record holder of the shares (Cedefast) did through proxies submitted by its duly constituted agents, Provident and CNB, both of whom derived their authority from Cede's Omnibus Proxy. (Ex. 1014p) The plaintiffs' position is that the inspectors should have acted not on the basis of Provident and CNB proxies, but instead on the basis of purported knowledge as to the intent of just two of the many beneficial owners of Great Country stock. The very point of Section 33-311a is to permit the corporation and the inspectors of election to avoid the quicksand of endless disputes about the intent of beneficial owners, and to look solely to what the record holders and their agents have done.
"It is no accident that Connecticut's statutes deal so completely and precisely with the issues that plaintiffs would prefer to have judged on broad "equitable" grounds unfettered by statutory standards. Following a general revision of the Connecticut Stock Corporation Act enacted in 1959 (to become effective in 1961), the General Assembly established a six-member commission headed by Bayless Manning, a member of the Connecticut bar and then a professor at the Yale Law School, to study the new act and, with substantial input from Connecticut practitioners, to recommend technical amendments. In commenting thereafter on Section 33-311 [now designated section 33-311a] as amended pursuant to the recommendations of that commission, Professor Manning stated in a law review article as follows:
 No other corporation statute gives the same attention to the important problem of corporate recognition of voting and other rights of record and nonrecord shareholders. Issues in this area continuously plague corporate administration, particularly where the corporation has an active business life, where shares are widespread and frequently traded, or where a proxy contest is in process. Corporate secretaries and corporate CT Page 2680 transfer agents should become familiar with the new section 33-111 * * *."
The mistakes, if any, as to the CNB and Provident proxies were made by the record holders. Beneficial owners could have avoided this mistake by obtaining legal proxies to vote their own shares.
III. Breach of Fiduciary Duty
In the third count of their complaint, plaintiffs claim that the management of the Bank has a fiduciary obligation to the Bank's shareholders to ensure that the election of corporate officers is conducted fairly and honestly. Likewise, the Inspectors, by virtue of their positions as Inspectors, employees and officers of the Bank, owe the same fiduciary obligation to the Bank's shareholders.
Plaintiffs argue that by interpreting the SFS and DFA proxies as superseding all of the prior proxies of CNB and Provident, despite the fact that this result was contrary to the known intentions of CNB and Provident (the voting shareholders), and the known intentions of each of the beneficial owners, the Inspectors and the Bank's management violated their fiduciary obligations.
Just as with the first two counts, Connecticut law specifically provides to the contrary: not only is there no such duty, but in fact the corporation and its voting inspectors are specifically privileged from having to inquire into the intent of the beneficial owners and are immune from liability for failing to do so. Conn. Gen. Stat. section33-311a (1989) expressly provides:
 (a) As used in this section: (1) "Recordholder" means the person or persons in whose name a security in registered form is registered at the time in question, or at the applicable record date or applicable date on which share transfer books were closed pursuant to section 33-310; (2) "security" means a security as defined in section 42a-8-102 issued by a corporation; (3) "vote" means to vote a security in person or by proxy, or execute proxies, whether special or general or discretionary waivers, consents or objections in respect thereof, or otherwise to represent a security, for the purpose of ascertaining a quorum or otherwise.
(b) Subject to the further provisions of this CT Page 2681 section, (1) a corporation may treat the recordholder of a security as the absolute owner thereof, as if such recordholder had full competency, capacity and authority to exercise all rights of ownership, irrespective of any knowledge or notice to the contrary, or any description appearing upon its records or upon the security indicating a representative, pledge or fiduciary relation or referring to any other instrument or to the rights of any other person; (2) a corporation shall not be obligated to inquire into the existence of, or see to the performance or observance of, any duty or obligation to a third party by a recordholder or by any one who exercises any rights in respect of a security as permitted or required by this section. (emphasis added)
 k) A corporation shall incur no liability to any person by the exercise of any privilege to which it is entitled by this section, nor shall any of its rights be thereby impaired nor shall any of its acts or any corporate meeting be thereby invalidated. When, in accordance with any of the provisions in this section, the corporation has treated a minor as entitled to exercise any rights of ownership in its securities, no subsequent disaffirmance or avoidance shall be effective as against the corporation. (emphasis added) (n) The rights, privileges and immunities afforded to the corporation in this section shall extend also to each transfer agent and to each registrar of its securities, to its voting inspectors and to all agents of the corporation concerned with the exercise of any rights by any of its security holders. (emphasis added)
From a plain reading of the statute, the court finds that neither the bank nor its voting inspectors had a duty to inquire into the existence of (much less perform) any duty to a third person (such as the beneficial owner) because they may treat the recordholder of the security as the absolute owner thereof, irrespective of any knowledge to the contrary. Judgment may enter in favor of the defendants on the third count.
IV. Improper Tabulation of the Shawmut Bank Shares
The Shawmut proxy in controversy (Ex. 1008P) consists of a blank management proxy card attached to two copies of a handwritten note which reads: CT Page 2682
"To whom it may concern:
 This letter serves to authorize Shawmut Bank to vote the 78,400 shares of Great Country Bank as follows:
 Proposal 1 — election of directors — For Proposal 2 — Ernst Whinney — For Proposal 3 — Other business — For
 Monica Nicastri SR. VP and TREASURER"
The inspectors construed this letter and blank proxy card as an expression on Shawmut's part to vote 78,400 shares for management.
Plaintiff challenges the tabulation of the Shawmut shares, claiming that the letter: (1) was not a proxy; (2) was not signed by a shareholder of record; (3) was not dated; and (4) failed to indicate it was voting for management. Plaintiff argues that there is no proxy duly executed by a shareholder of record which would support casting the 78,400 votes in anyone's favor, and therefore the votes cast for such shares must be ignored.
The court finds that the evidence in this case confirms that the person who signed the proxy, Monica Nicastri, is an officer of Suffield Bank, the beneficial owner of the shares, not Shawmut Bank, the record owner authorized to vote.
Conn. Gen. Stat. section 33-311a(d) (1989) states:
 Unless the instrument appointing a fiduciary or creating a fiduciary relationship otherwise provides, a fiduciary has full voting powers with respect to securities held by him. If securities stand of record in the name of a fiduciary, the corporation may treat such fiduciary as entitled to vote the same unless the secretary of the corporation is given written notice that the fiduciary is not so authorized and is furnished a copy of the instrument or order appointing the fiduciary or creating the fiduciary relationship where it is so provided.
The court finds that the securities in issue stood of record in the name of a fiduciary, Shawmut Bank, which had full voting powers since no written notice was submitted to CT Page 2683 the contrary by the beneficial owner, Sheffield Bank. Since there is no proxy duly executed by a shareholder of record, the votes cast for such shares should be ignored. Accordingly, the inspectors improperly tabulated the Shawmut shares and therefore judgment may enter in favor of the plaintiffs as to the fourth count.
The court finds that this does not affect the outcome of the election.
The results with respect to the above mentioned items are now as follows:
I. Quorum: 1,936,248 votes cast — 78,400 = 1,857,848
II. Results of the election of directors Nominee Votes
Basset 986,295 — 78,400 = 907,895
Buckley 1,123,995 — 78,400 = 1,045,595
Bustelos 984,212 — 78,400 = 905,812
Clemons 641,122
Quinn 995,295 — 78,400 = 916,895
Adams 752,186
McGrath 745,186
Olson 619,486
Staples 745,186
Von Seldeneck 1,095,186 — 78,400 = 1,016,786
(Ex. 18P [the official results of the election]).
Even if the Shawmut votes are invalidated and subtracted from those who received them, the "split slate" of officers still wins the election. (Ex. 18P).
V. Refusal to Seat Von Seldeneck (Fifth Count)
In the fifth count of their complaint, plaintiffs claim that the bank has improperly refused to seat Von Seldeneck on the board pending a review of "possible violations of the Change in Bank Control Act or the Bank Holding Company Act by CT Page 2684 the Von Seldeneck group." Plaintiffs argue that since Von Seldeneck was properly elected, the bank's refusal to seat him is a breach of duty and the court should order him seated as a director.
The court finds that with or without the Shawmut shares, Von Seldeneck received the second highest number of votes and was therefore duly elected as director of Great Country Bank. (Ex. 18P, supra, The official results of the election certified by the bank's own inspectors).
The only evidence at trial regarding Mr. Von Seldeneck not being seated was a news release by the Bank stating there was possible investigations by the FDIC or Federal Reserve Board of violations of the challenges.
The Bank's own inspectors reported Von Seldeneck as a winner. Von Seldeneck testified no such notice of investigation had been received by him from any federal agency.
Conn. Gen. Stat. section 33-315 provides:
 (a) Upon the application of any shareholder, director or person aggrieved, the superior court for the judicial district where the principal office of the corporation is located, or any judge thereof, shall forthwith hear and determine the validity of any election or appointment of any director or officer of a corporation and the right of any person to hold such office, and, if any such office is claimed by more than one person, determine the person entitled thereto, and to that end shall determine the voting and other rights of persons claiming the same in respect of such election or appointment, and confirm the election or appointment, order a new election as provided in section 33-332, or direct such other relief as may be just and proper. (emphasis added)
Accordingly, the court confirms the election of the candidates' asset, Buckley, Bustelos, Quinn and Von Seldeneck.
Von Seldeneck was duly elected, accordingly the Great Country Bank is ordered to seat him on its board of directors.
Judgment is entered in favor of the plaintiff Von Seldeneck on the fifth count. CT Page 2685
VI. Manipulative, Deceptive and Unfair Conduct by Bank Management (Sixth Count)
In the sixth count of their complaint, plaintiffs claim that the bank's management unfairly and deceptively manipulated the election to prevent any of the committee's candidates from winning a place on its board of directors. Plaintiffs argue that by appointing inspectors who were employees and officers of the bank, instead of independent inspectors, management assured that it would retain control over the tabulation of votes.
The court finds that the appointment of independent, outside or professional election inspectors is not required:
 Committee on Proxies. The Board, in advance of any shareholder's meeting, shall appoint three Inspectors to act as a Committee on Proxies and as Tellers at the meeting or any adjournment thereof. In case any person appointed fails to appear or act, the vacancy may be filled by appointment made by the Board in advance of the meeting or at the meeting by the presiding officer. The Inspectors shall receive and take in charge the proxies and ballots, shall decide all questions concerning the qualification of voters, the validity of proxies and the acceptance or rejection of votes, and shall count the ballots cast and report to the presiding officer the result of the vote.
Bylaws of Great Country Bank, Article II, section 10.
The remainder of this count alleges manipulative conduct on the part of management and Morrow Co. (management's proxy solicitor) designed to intentionally secure proxies that could be used to vote all CNB and Provident shares for the split slate. The court finds that plaintiffs have failed by a fair preponderance of the evidence to support these allegations.
The last minute solicitation of the challenged proxies were not unlawful since solicitation can be exercised up to the closing of the polls which was at 11 o'clock a.m., September 18, 1989. The plaintiffs do not dispute the validity of the CNB/SFS and Provident/DFA proxies, only the interpretation.
The late proxy solicitation of the two disputed proxies were for other purposes, i.e., control of the meeting. Stephen Smith testified he wanted to have management control CT Page 2686 the meeting. Other solicitation were neither deceitful nor manipulative.
Accordingly, judgment may enter in favor of the defendants on the sixth count.
Conclusions
For all of the foregoing reasons, the court enters judgment for the plaintiffs as to the fourth and fifth counts and judgment for the defendants on the first, second, third and sixth counts.
In accordance with this judgment, the court confirms the results of the inspectors of the election of Great Country Bank (except for the voting of the Shawmut shares).
G. Clay Von Seldeneck along with the rest of the "split slate" of management candidates (Basset, Buckley, Bustelos and Quinn) are ordered seated as the five duly elected directors of Great Country Bank.
FRANK S. MEADOW, JUDGE